[No. D025434. Fourth Dist., Div. One. July 15, 1997.]

VINCENT BRADLEY, Plaintiff and Appellant, v.
MEDICAL BOARD OF CALIFORNIA et al., Defendants and
Respondents.

**COUNSEL**

Samuel Jefferson Frazier III and Audrey Powers Thornton for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Margaret A. Rodda, Assistant Attorney General, Kristin G. Hogue and Lori Kanda Kelly, Deputy Attorneys General, for Defendants and Repondents.

**OPINION**

**WORK, Acting P. J.**—After the Medical Board of California's (the Board)[1] undercover investigation, it brought a disciplinary action against Vincent Bradley, M.D., charging him with unprofessional conduct consisting of "[p]rescribing . . . dangerous drugs . . . without a good faith prior examination and medical indication therefor . . . ." (Bus. & Prof. Code, §§ 2234, 2242, subd. (a).) Ultimately, Dr. Bradley voluntarily surrendered his medical license. He then sued the Board, the State of California (the State) and numerous individuals for violating his federal and state constitutional due process rights, and here appeals a defense summary judgment motion, in part based on defendants' immunities. We affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

In 1988, the Board received a letter from Mrs. B., registering a complaint against her daughter-in-law Lori B.'s physician, Dr. Bradley. According to Mrs. B., Lori was "seriously hooked on drugs," and "when confronted with her drug problem [Lori] states she knows she is hooked on pain killing drugs and that 'Dr. Bradley keeps her comfortable'." Within a two-week period, Dr. Bradley purportedly wrote Lori six prescriptions for more than three hundred fifty tablets of various drugs, including Demerol, Percocet, Vicodin and Dalmane.

---

[1] At the time the Board was known as the Board of Medical Quality Assurance.

Ed Raley, a senior investigator with the Board, decided to conduct an undercover investigation into Dr. Bradley's prescription writing practices. Cynthia Brandenburg, also a Board investigator, Lisa Vitali and Deborah Giles, none of whom had a weight problem, agreed to act as Dr. Bradley's "patients." Raley instructed them "to request a drug, but to not suggest an ailment or a medical condition, nor admit to a medical problem." Raley obtained the district attorney's permission to record the "patients'" conversations with Dr. Bradley; however, only some of the conversations were actually recorded.

The women visited Dr. Bradley several times over approximately nine months, complaining of vague stomach problems. In addition, they requested drug prescriptions for unrelated reasons. For instance, at the end of one visit, Giles asked Dr. Bradley for a Fastin prescription, not for weight control but because she had been taking it daily for "energy." Dr. Bradley complied. Giles returned a few months later for a prescription renewal, again advising Dr. Bradley she took Fastin only for extra energy. Again, Dr. Bradley complied.

Similarly, Brandenburg told Dr. Bradley she regularly took Fastin before exercising because it gave her extra energy. He complied with her request for a prescription. When Brandenburg returned for a renewal prescription, Dr. Bradley told her Fastin was not meant for extra energy and that she should try to taper off; however, he wrote her a prescription. On a third visit, Dr. Bradley noted Brandenburg took Fastin "mainly just for energy," and did not "really need it." Dr. Bradley told Brandenburg, "[y]ou probably aren't as dependent on [Fastin] as you think, but it's the idea—it has helped you for a period of time, and your body thinks it's dependent on it." While advising Brandenburg to taper off the drug, he wrote her another Fastin prescription.

Dr. Bradley prescribed one hundred Valiums for Vitali, after she told him she was not under stress, but customarily took them four or five times a week because they made her "feel good." A month later, Vitali told Dr. Bradley she had misplaced the Valium during a move, and he prescribed another 100 tablets.

Raley sent the women's declarations regarding the above to Irving Horowitz, M.D., a licensed physician with expertise in chemical dependency, drug abuse and inappropriate drug prescribing. In a written report, Dr. Horowitz stated "no medical indication or pathology was demonstrated for [Dr. Bradley's] writing of [the] prescriptions," and thus he concluded "the prescribing practices of Dr. Bradley in these instances [were] ill-advised, anti-therapeutic and inappropriate."

Based upon Dr. Horowitz's report, Raley obtained a search warrant under Penal Code section 1524[2] and seized Dr. Bradley's records regarding Brandenburg, Giles and Vitali. While the records showed the Fastin prescriptions, they did not show Vitali's prescriptions for Valium. After reviewing the records, Dr. Horowitz wrote in a supplemental report he believed Dr. Bradley's practices constituted incompetence, described as "a lack of knowledge and/or ability in discharging professional medical judgment," and simple negligence, described as "a simple departure from the standard of medical practise [sic]." Raley referred the matter to the state Attorney General's office for disciplinary action.[3]

Deputy Attorney General Robert Whitlock filed an accusation against Dr. Bradley, charging him with seven counts of unprofessional conduct and requesting his license be suspended or revoked. After Dr. Bradley was served, the case was transferred to Deputy Attorney General Sherry Ledakis, and she filed an amendment to the accusation charging that in 1990 Dr. Bradley had pled no contest to a misdemeanor violation of Business and Professions Code section 4232, which requires physicians to maintain records of the disposition of dangerous drugs during business hours.[4]

Ledakis also realized the accusation contained no charge regarding Lori B. She obtained Lori's authorization to release her medical records; however, Dr. Bradley refused to comply. In the meantime, Ledakis sent Mrs. B.'s letter to David Bortz, M.D., for an evaluation. Dr. Bortz also spoke with Lori, who told him Dr. Bradley's drug prescriptions "led to her becoming seriously drug addicted." Dr. Bortz issued a preliminary report stating, "[o]n the basis of the information supplied by the patient, I feel that Dr. Bradley has been negligent in providing this standard of care. If in addition it turns out that he failed to inform the patient of the addictive nature of the medications prescribed, he will have shown to be grossly negligent. [¶] My final point is to emphasize that patients with narcotic additions [sic] can be extremely manipulative and accordingly, Dr. Bradley's input is of great importance."

---

[2]The court found there was "substantial probable cause for the issuance of the search warrant pursuant to Penal Code section 1524 . . . ." That section provides a search warrant may be issued when "the property or things to be seized consist of any item or [1] constitute any evidence [2] that tends to show a felony has been committed, or tends to show that a particular person has committed a felony." (Pen. Code, § 1524, subd. (a)(4).)

[3]The Attorney General acts as legal counsel for the Board in judicial and administrative proceedings. (Bus. & Prof. Code, § 2020.)

[4]In the criminal matter, in addition to the Business and Professions Code section 4232 charge, Dr. Bradley was charged with seven counts of prescribing drugs "for other than a legitimate medical purpose," in violation of Health and Safety Code section 11153, subdivision (a).

After Ledakis amended the accusation to include a charge Dr. Bradley violated Business and Professions Code section 725 by excessively prescribing drugs to Lori, he released her records. After reviewing them, Dr. Bortz changed his mind and determined Dr. Bradley's treatment of Lori was appropriate. However, he noted the medical records were "nearly perfect" and suggested a handwriting expert examine the originals to see if they were authentic. Because the handwriting expert could not determine if any alterations had been made, Ledakis dismissed the charge pertaining to Lori.

On the fourth day of the hearing on the accusation, Dr. Bradley's attorney, Ron Frant, advised the administrative law judge Dr. Bradley had been admitted to an emergency room with chest pains. The matter was continued, and at a status conference a week later Frant submitted declarations from a cardiologist and a psychiatrist attesting that Dr. Bradley "suffered from 'coronary artery spasms' and . . . could not tolerate the stress of participating in his own defense, nor could he tolerate the stresses of medical practice."

The Board then ordered Dr. Bradley to undergo physical and psychiatric examinations to determine if he was capable of safely practicing medicine. When Dr. Bradley refused, the Board instead accepted his written stipulation agreeing he "will not practice medicine until such time as he has been examined by Board appointed physicians in psychiatry and cardiology and they both agree that he is physically and mentally capable of practicing medicine safely." During the meeting in which the stipulation was agreed to, Dr. Bradley advised he would be attending naval reserve duty in Spain, but he would not practice medicine there. Dr. Bradley signed the stipulation on August 20, 1992. Over the next year, status conferences were held every two to three months regarding Dr. Bradley's condition. Each time, Frant informed the Board and judge that Dr. Bradley remained physically and mentally impaired and unable to participate in hearings.

The Navy informed Ledakis that shortly after stipulating not to practice medicine, Dr. Bradley submitted an application for clinic privileges, stating he had "no current or physical impairment that could limit [his] clinical abilities," and "[t]o [his] knowledge, [he is] not currently under any investigation involving substandard clinical practice, malpractice, or personal misconduct." The Navy granted permission, and Dr. Bradley consulted with 28 patients during his reserve duty.

Shortly after Ledakis learned this information, Frant again told the judge and Board that Dr. Bradley remained unable to practice medicine or participate in any hearings. Ledakis informed the judge of Dr. Bradley's military

activities, and the matter was set for a settlement conference. Dr. Bradley appeared at the meeting, and after negotiating with the Board and on Frant's advice, Dr. Bradley signed a stipulation, effective August 9, 1993, to surrender his medical license "in order to avoid the possibility of another amended accusation being filed against him, this time based upon fraud and unprofessional conduct for misrepresentations."

Dr. Bradley then sued the Board, the State, Raley, Brandenburg, Giles, Vitali, Dr. Horowitz and Ledakis. He alleged they violated his state and federal constitutional substantive and procedural due process rights by fabricating evidence to obtain a search warrant; entrapping him by using illegal wiretaps and "misrepresenting their true medical condition to induce [him] to prescribe prescription drugs for conditions that did not exist"; forcing and coercing him "to surrender his medical license without cognizable evidence supporting the charges against him"; invading his privacy, and failing to adhere to proper notice and hearing procedures.[5]

Defendants moved for summary judgment, arguing among other things, Dr. Bradley's claims under 42 United States Code section 1983[6] were time-barred; there was no private right to monetary recovery for a violation of the state due process clause, and in any event, defendants were immune from suit. The court granted summary judgment. It determined Dr. Bradley's section 1983 claims arose on August 20, 1992, when he stipulated he would not practice medicine without permission from Board-appointed experts. Because the section 1983 claims were subject to a one-year statute of limitations, they were thus barred.

The court further determined Dr. Bradley's section 1983 claims failed because Ledakis was entitled to absolute immunity as her involvement was limited to the prosecutorial function; Raley and Brandenburg, employees of the Board, were entitled to qualified immunity as their conduct was reasonable; and private defendants Dr. Horowitz, Vitali and Giles were also entitled to qualified immunity under an exception to the general rule denying

---

[5]As amended and after defendants' demurrers, Dr. Bradley's complaint contained a claim against all defendants for violation of his state constitutional due process rights (Cal. Const., art. I, § 7, subd. (a)) (second cause of action), and claims against all defendants but the State for violation of his federal Fourteenth Amendment due process rights and conspiracy to deprive him of his federal due process rights (42 U.S.C. § 1983 [denial of civil rights under color of law]) (first and third causes of action, respectively).

[6]All section references are to 42 United States Code except where otherwise specified. At the relevant time, section 1983 provided in part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

immunity to private parties. Lastly, the court found there is no cause of action for monetary damages under article I, section 7, subdivision (a) of the California Constitution. On appeal, Dr. Bradley contends each of the court's determinations was in error.

## STANDARD OF REVIEW

■ Summary judgment is proper only where there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) ■ "On review of a summary judgment in favor of the defendant, we review the record de novo to determine whether the defendant has conclusively negated a necessary element of the plaintiff's case or demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial. [Citation.]" (*Ann M.* v. *Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673-674 [25 Cal.Rptr.2d 137, 863 P.2d 207].)

## DEFENDANTS ARE IMMUNE FROM SECTION 1983 CLAIMS

### *Deputy Attorney General Ledakis Is Entitled to Absolute Immunity*

■ "Because section 1983 was intended by Congress as a remedy to prevent unconstitutional acts by state and local officials, we must look to federal law to determine the scope of immunity of governmental officials from a section 1983 suit. [Citations.] [¶] In *Imbler* v. *Pachtman* (1976) 424 U.S. 409 [47 L.Ed.2d 128, 96 S.Ct. 984] (*Imbler*), the United States Supreme Court . . . held that prosecutors enjoy absolute immunity from section 1983 suits for their activities in initiating and presenting the state's case, as well as for conduct 'intimately associated with the judicial phase of the criminal process . . . .' [Citation.][7]

"Subsequently in *Burns* v. *Reed* (1991) 500 U.S. 478, 492-493 [114 L.Ed.2d 547, 564-565, 111 S.Ct. 1934] (*Burns*) the high court was confronted with a section 1983 suit alleging that a prosecutor had procured false testimony at a probable cause hearing to obtain a search warrant and had also given erroneous legal advice to the police. The high court held that the prosecutor was absolutely immune from liability for the former activity but enjoyed only qualified immunity[8] for the latter, since the giving of advice to the police was not closely connected to the judicial phase of the criminal process.

---

[7]The absolute prosecutorial immunity extends to state administrative proceedings. (*Butz* v. *Economou* (1978) 438 U.S. 478, 514 [98 S.Ct. 2894, 2914-2915, 57 L.Ed.2d 895]; *Sellars* v. *Procunier* (9th Cir. 1981) 641 F.2d 1295, 1303.)

[8]As discussed at greater length later, "[u]nlike absolute immunity, which shields the defendant no matter how egregious or intentional the conduct, qualified immunity shields

"The contours of prosecutorial immunity were more finely delineated in *Buckley* v. *Fitzsimmons* (1993) [509] U.S. [259] [125 L.Ed.2d 209, 113 S.Ct. 2606] (*Buckley*). There, prosecutors allegedly frustrated by their inability to obtain an indictment, manufactured false evidence inculpating the defendant and held a press conference at which they slandered him. In a five-to-four decision the high court recalled the 'functional approach' to government official immunity articulated in *Burns* 'which looks to "the nature of the function performed, not the identity of the actor who performed it." ' [Citations.] While reiterating that prosecutorial immunity extends to acts preparatory to the commencement of a prosecution, even outside the courtroom [citation], the court held that by working 'hand in hand' with sheriff's detectives to fabricate inculpatory evidence, the prosecutors acted not as advocates but as investigators, functionally no different than that of the sheriff or police department. [Citation.] Thus, the conduct was entitled to only qualified immunity." (*Gensburg* v. *Miller*, *supra*, 31 Cal.App.4th at pp. 519-520.)

█ Dr. Bradley asserts that under *Buckley*, *supra*, 509 U.S. 259, Ledakis is not entitled to absolute immunity because she and Raley "sought out a retired doctor, whose opinion was obviously outdated and untrustworthy, to fabricate and provide an opinion that [Dr. Bradley] had breached his duty of care. [They] procured this fabricated evidence for the purpose of obtaining an indictment by the . . . Board." Dr. Bradley, however, produced no evidence Ledakis was involved in selecting Dr. Horowitz, and, to the contrary, admitted she had no involvement with the case until long after the Board completed its investigation and turned the matter over to the Attorney General's office.

Dr. Bradley also asserts Ledakis "omitted and suppressed all exculpatory evidence that Dr. Bradley had not violated the standard of care with respect to [Lori B.] who was the subject of the initial complaint against him. [¶] Ledakis' fabrication of charges relating to Lori B. against Dr. Bradley was a clear violation of Dr. Bradley's right to due process. She used this manufactured accusation to coerce Dr. Bradley into signing the stipulation." Dr. Bradley, however, produced no evidence indicating Ledakis suppressed favorable evidence or fabricated charges related to Lori B. While Dr. Bortz ultimately informed Ledakis Lori's medical records indicated appropriate treatment, Ledakis did not have that information when she filed the amended accusation because Dr. Bradley refused to turn over Lori's medical records sooner.

only that conduct of a governmental official which he or she reasonably believed to be lawful in light of the clearly established law and facts of the case. [Citation.]" (*Gensburg* v. *Miller* (1994) 31 Cal.App.4th 512, 519, fn. 2 [37 Cal.Rptr.2d 97].)

We conclude Ledakis was absolutely immune from Dr. Bradley's section 1983 claims. "[A]cts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his [or her] role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence assembled" by the investigative agency against the accused. (*Buckley* v. *Fitzsimmons, supra,* 509 U.S. 259, 273 [113 S.Ct. 2606, 2615, 125 L.Ed.2d 209].) The only arguably "investigative" task Ledakis undertook was consulting with Dr. Bortz preparatory to amending the accusation to charge Dr. Bradley with improperly treating Lori B. In doing so, Ledakis was merely evaluating evidence supplied by the Board; her inquiry was intimately associated with the disciplinary proceedings and thus absolutely protected.[9]

### Board Employees Raley and Brandenburg Are Entitled to Qualified Immunity

■ The qualified immunity defense protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (*Harlow* v. *Fitzgerald* (1982) 457 U.S. 800, 818 [102 S.Ct. 2727, 2738, 73 L.Ed.2d 396].) The mere assertion, however, of a vague constitutional right to, for instance, due process, will not defeat a qualified immunity defense. Rather, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that *what he is doing* violates that right." (*Anderson* v. *Creighton* (1987) 483 U.S. 635, 640 [107 S.Ct. 3034, 3039, 97 L.Ed.2d 523], italics added.)

■ When qualified immunity is asserted, we must undertake a two-step analysis: "(1) Was the law *governing the official's conduct* clearly established? (2) Under that law, could a reasonable officer have believed the conduct was lawful?" (*Neely* v. *Feinstein* (9th Cir. 1995) 50 F.3d 1502, 1507, italics added.)[10] A government official is entitled to qualified immunity even where reasonable officers may disagree as to his or her conduct, as long as

---

[9]At any rate, even if absolute immunity were inapplicable, Ledakis would be entitled to qualified immunity under principles discussed below.

[10]The questions are ones of law, although the latter one may require factual determinations as well. (*Romero* v. *Kitsap County* (9th Cir. 1991) 931 F.2d 624, 627.) "The plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the

the conclusion is objectively reasonable. (*Act Up!/Portland* v. *Bagley* (9th Cir. 1993) 988 F.2d 868, 872.)

██ Dr. Bradley asserts Raley violated his federal due process rights[11] by unreasonably launching an undercover investigation without "confirmation or validation" of Mrs. B.'s complaints regarding Lori B. In support, he filed the declaration of a retired law enforcement officer attesting he believed further investigation should have been done.[12] While not directly stating so, Dr. Bradley apparently claims he had a right to be free from any investigation absent the type of "probable cause" required for a search warrant or arrest. Dr. Bradley has cited no law, however, suggesting the Board was prohibited from investigating him absent probable cause. To the contrary, it has been held in the entrapment context, " 'it is inconsequential whether law enforcement officials did or did not act on well-grounded suspicion that the defendant was engaging in wrongdoing, or whether they had probable cause for approaching the defendant.' " (*United States* v. *Jannotti* (3d Cir. 1982) 673 F.2d 578, 609, italics omitted.) "Where the conduct of the investigation itself does not offend due process, the mere fact that the investigation may have been commenced without probable cause does not bar the conviction of those who rise to its bait." (*Ibid.*)

Here, the Board is statutorily required to investigate complaints from the public "that a physician . . . may be guilty of unprofessional conduct" (Bus. & Prof. Code, § 2220, subd. (a)), which includes "[p]rescribing . . . dangerous drugs . . . without a good faith prior examination and medical indication therefor . . . ." (Bus. & Prof. Code, § 2242, subd. (a).) Board investigators "have the authority of peace officers while engaged in exercising the powers granted or performing the duties imposed upon them . . . in investigating the laws . . . or commencing directly or indirectly any criminal

---

alleged misconduct. [Citation.] If plaintiff carries this burden, then the officers must prove that their conduct was reasonable even though it might have violated constitutional standards. [Citation.]" (*Ibid.*)

[11]The due process clause of the Fourteenth Amendment provides: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law." It was " ' "intended to secure the individual from the arbitrary exercise of the powers of government." ' " (*Daniels* v. *Williams* (1986) 474 U.S. 327, 331 [106 S.Ct. 662, 665, 88 L.Ed.2d 662].)

[12]The declarant stated: "A reasonable and well-trained investigator in receipt of a complaint such as the letter from Mrs. B[.] . . . would require corroborating evidence of the complaint prior to initiating an undercover investigation of the doctor, particularly where a wire will be used to record conversations. . . . I would require that an investigator contact the complainant to discuss the nature of the complaint and to determine or verify the source of their information. I would also require a check on the actual prescription complained about to determine whether the quantity and type of drug was medically indicated. It is a routine procedure to check the actual prescriptions to determine whether there has been any forgery by the patient and to provide verification of the quantity. . . ."

prosecution arising from any investigation conducted under these laws." (Bus. & Prof. Code, § 160.) Where a physician is suspected of improperly prescribing drugs, an investigation may be surreptitious and include undercover operatives posing as "patients" making false representations.[13] (See *Perzik* v. *Superior Court* (1991) 2 Cal.App.4th 898, 900 [4 Cal.Rptr.2d 1]; *People* v. *Lonergan* (1990) 219 Cal.App.3d 82, 87 [267 Cal.Rptr. 887]; *Whitlow* v. *Board of Medical Examiners* (1967) 248 Cal.App.2d 478, 490 [56 Cal.Rptr. 525].)

Dr. Bradley also asserts Raley violated his constitutional rights by obtaining a search warrant without probable cause. ■ It is established that where, as here, evidence of criminal activity is sought by an administrative agency, the warrant under which a search is conducted must be supported by probable cause. (*Michigan* v. *Clifford* (1984) 464 U.S. 287, 294 [104 S.Ct. 641, 647, 78 L.Ed.2d 477].) Probable cause exists where "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has or will be committed. (*Carroll* v. *United States* (1925) 267 U.S. 132, 162 [45 S.Ct. 280, 288, 69 L.Ed. 543, 39 A.L.R. 790].)

■ Dr. Bradley argues a reasonable person in Raley's situation would not have applied for a search warrant because no legal opinion probable cause existed was obtained. There is, however, no such requirement. Dr. Bradley also claims Raley's reliance upon Dr. Horowitz was misplaced because he was 75, "had not had an active clinical practice since 1973 and . . . was not aware of the community standard of care in writing the type of prescriptions in issue." Dr. Bradley relies upon the declaration of another physician stating Dr. Horowitz "is not qualified to render an opinion on the standard of care or comment on a person's clinical pharmacological prescribing practice in 1989 because he has not practiced medicine since 1977. There has been a dramatic change in medicine since the date that Dr. Horowitz . . . stopped practicing." We do not join Dr. Bradley and his expert in adding dwindling professional competence after retirement to a

---

[13]As attested to by a supervising investigator for the Board, "[u]ndercover operations are routinely used by the Medical Board . . . to investigate complaints . . . of overprescribing or drug addiction because . . . the Board cannot often obtain the cooperation of the patient/ addict as they do not want to cut off their source of drugs. The addict may also conspire with the prescribing physician to protect their source. [¶] The investigator must determine if there is a pattern of mis-prescribing or assess the practice of the subject physician to obtain independent and corroborating evidence to substantiate or refute the allegations. A suspected physician is not typically contacted because . . . in the Board's experience, a notified physician may alter or destroy records. [¶] [U]ndercover operatives are used in order to determine the validity of the complainant's allegations and whether . . . to proceed with an investigation."

supposed laundry list of life's inevitabilities. In any event, Dr. Horowitz's responding declaration put the matter to rest: "I am not an 'elderly retired doctor' as alleged by plaintiff. I currently am and at all times relevant to this case a duly licensed physician in the State of California. I have extensive training and background in the area of chemical dependence/drug abuse and inappropriate prescribing of classified drugs. I currently am the Medical Director of the San Diego City Jail in Otay Mesa. I actively treat patients and am involved in patient care. I supervise a staff of approximately nine to ten nurses . . . . [¶] While I was not in private practice in 1989 and 1990 when I rendered my opinions in this case, I was the Director of the San Diego Health Alliance which concentrates ninety percent of its efforts in the area of drug abuse. As the Director, I examined and evaluated all patients who applied for treatment in the San Diego Health Alliance program. I also supervised a nursing staff of four individuals and two physician assistants. I also had direct contact with patients who had drug and/or alcohol abuse problems." Raley's reliance upon Dr. Horowitz's opinion in obtaining the search warrant was reasonable.

Lastly, Dr. Bradley argues Raley unreasonably relied upon Giles's declaration he prescribed Fastin to her for "energy," because it conflicts with the recording from the office visit which shows she advised of a weight gain. The argument is meritless. Early in the visit, Dr. Bradley asked Giles: "How has your weight been? Any major change?" Giles replied, "It's up a little bit, maybe about five pounds." After that, Dr. Bradley examined Giles for an ostensible gastrointestinal problem. At the very end of the visit, the following exchange took place:

"Ms. GILES: . . . I just wanted to ask you. I (indiscernible words) taking a prescription for Fastin.

"DR. BRADLEY: Fastin?

"Ms. GILES: Yeah.

"DR. BRADLEY: Do you think you've gained enough weight or what?

"Ms. GILES: No, it just gives me energy[.]

"DR. BRADLEY: Have you taken very much of it before?

"Ms. GILES: Yeah, I've been taking it for awhile.

"DR. BRADLEY: For awhile. (Indiscernible words) Yeah, let me write this. [¶] Do you take one every day, or do you just kind of—

"Ms. GILES: Pretty much, I do, yeah, if I've got it." Clearly, Dr. Bradley understood the request for Fastin had nothing to do with weight control, and thus Giles's failure to include mention of a five-pound weight gain was unimportant and not indicative of sinister motives on her or Raley's part.

In summary, there has been no showing Raley's conduct violated clearly established constitutional rights of which a reasonable person would have known. Further, while Dr. Bradley also argued Brandenburg was not entitled to qualified immunity, he specified neither any right she ostensibly violated nor complained of any particular conduct, and there is no law prohibiting her from acting as a "patient." The court's ruling was proper.

### Private Citizens Dr. Horowitz, Vitali and Giles Are Also Entitled to Qualified Immunity

In *Lugar* v. *Edmondson Oil Co., Inc.* (1982) 457 U.S. 922 [102 S.Ct. 2744, 73 L.Ed.2d 482], the Supreme Court held that a private party acting jointly with state agents to deprive constitutional rights may be liable under section 1983. (457 U.S. at p. 941 [102 S.Ct. at pp. 2755-2756].) The court expressly reserved the question of qualified immunity for private participants. (*Id.* at p. 942, fn. 23 [102 S.Ct. at p. 2756].)

In *Wyatt* v. *Cole* (1992) 504 U.S. 158 [112 S.Ct. 1827, 118 L.Ed.2d 504] (*Wyatt*), the court held that private defendants acting under a state replevin statute were not entitled to qualified immunity against section 1983 claims. The court reviewed the special policy concerns involved in suing government officials and found them lacking. (504 U.S. at p. 167 [112 S.Ct. at pp. 1832-1833].) Private parties, the court reasoned, "hold no office requiring them to exercise discretion; nor are they principally concerned with enhancing the public good. Accordingly, extending . . . qualified immunity to private parties would have no bearing on whether public officials are able to act forcefully and decisively in their jobs or on whether qualified applicants enter public service. Moreover, unlike with government officials performing discretionary functions, the public interest will not be unduly impaired if private individuals are required to proceed to trial to resolve their legal disputes. In short, the nexus between private parties and the historic purposes of qualified immunity is simply too attenuated to justify such an extension of our doctrine of immunity." (*Id.* at p. 168 [112 S.Ct. at pp. 1833-1834].)

█ Dr. Bradley unpersuasively contends *Wyatt* precludes the possibility of qualified immunity for Dr. Horowitz, Vitali and Giles. In *Wyatt,* the court cautioned: "The precise issue [decided], is whether qualified immunity . . .

is available for private defendants faced with a section 1983 liability for invoking a state replevin, garnishment, or attachment statute. The answer is no." (504 U.S. at pp. 168-169 [112 S.Ct. at p. 1834].) Thus, the court did not "foreclose the possibility that under certain circumstances a private defendant could be entitled to an affirmative defense based on qualified immunity." (*Kennedy* v. *Widdowson* (D.Md. 1992) 804 F.Supp. 737, 740, fn. 4.)

Indeed, in several post-*Wyatt* decisions, courts have held the particular facts justified extending qualified immunity to private defendants. For instance, in *Warner* v. *Grand County* (10th Cir. 1995) 57 F.3d 962 (*Warner*), the court addressed the question whether "a private individual who performs a unique government function at the request of a state official who enjoys qualified immunity also enjoy[s] qualified immunity?" (*Id.* at p. 965.) Robin Parker was requested by the sheriff's department to conduct strip searches of two female detainees. In its analysis, the court relied upon *Rodriques* v. *Furtado (Rodriques)* (1st Cir. 1991) 950 F.2d 805, in which qualified immunity was extended to a private physician who had conducted an intrusive search of a prisoner, because unlike where private parties are motivated only by selfish means, ". . . state officials were the initiating parties and they pressed a private citizen into assisting their efforts." (*Id.* at p. 815.) Further, "[t]he scope and motivation for the search were established solely by the state's investigatory goals and justified solely by the search warrant. Dr. Falkoff's role in the search was purely that of an auxiliary to normal police search procedures. He exercised the power of search traditionally reserved exclusively to the State, [citations]. . . ." (*Id.* at p. 814.)

In extending qualified immunity to Parker, the *Warner* court noted she, "like Dr. Falkoff, was called upon by the state to perform an investigatory function . . . . While the court in *Rodriques* emphasized that Dr. Falkoff acted pursuant to a facially valid search warrant, we believe there is no functional difference between a doctor executing a search warrant and Ms. Parker executing an officer's ostensibly pressing request to conduct a strip search. In both cases, the state 'requested' that a private citizen serve as its agent to carry out a task it was underqualified to perform itself." (*Warner, supra,* 57 F.3d at p. 965.) Parker had no personal animosity towards the women she searched, but "followed the ostensibly legitimate orders of a state official for the mere purpose of assisting the state with its investigatory powers." (*Ibid.*) Additionally, "[i]f Ms. Parker, or others like her, are not permitted to raise the shield of qualified immunity, they might reject requests to aid state officials in performing governmental functions. This would clearly constrain state officials' agility in performing such functions, frustrate the government's investigatory power, and thereby limit the state's ability to service the public good. . . . [¶] We have already determined that

Officer Richmond is entitled qualified immunity for his role in the strip searches. It would be anomalous to deny Ms. Parker qualified immunity when Officer Richmond would have received immunity had he performed the search. We hold that a private individual who performs a government function pursuant to a state order or request is entitled to qualified immunity if a state official would have been entitled to such immunity had he performed the function himself. We believe that this holding is consistent with the Supreme Court's decision in *Wyatt* and the policy rationale that has shaped the qualified immunity defense from its inception." (57 F.3d at p. 967.) (See also *Eagon Through Eagon* v. *City of Elk City, Okl.* (10th Cir. 1996) 72 F.3d 1480, 1489 [private party asked by city to determine what displays would be allowed at a municipal function entitled to qualified immunity]; *Citrano* v. *Allen Correctional Center* (W.D.La. 1995) 891 F.Supp. 312, 318-319 [employees of private contractor operating correctional center entitled to qualified immunity]; *Sherman* v. *Four County Counseling Center* (7th Cir. 1993) 987 F.2d 397, 405 [private facility which treated patient pursuant to court order entitled to qualified immunity].)

We are persuaded by the reasoning of *Rodriques* and *Warner*, and hold that Dr. Horowitz, Vitali and Giles are entitled to qualified immunity as their actions were objectively reasonable. As discussed, Raley and Brandenburg are entitled to immunity from liability for their part in the undercover investigation of Dr. Bradley; it would be anomalous not to extend the same protection to the private defendants who had no ax to grind with Dr. Bradley but were merely assisting the Board at its request.[14]

### THERE IS NO RIGHT TO SUE FOR DAMAGES UNDER ARTICLE I, SECTION 7, SUBDIVISION (a) OF THE CALIFORNIA CONSTITUTION

Dr. Bradley also sought money damages for defendants' alleged violation of his state due process rights. Article I, section 7, subdivision (a) of the California Constitution provides in pertinent part: "A person may not be deprived of life, liberty, or property without due process of law. . . ." There is, however, no right to sue for monetary damages under this

---

[14]We note the Ninth Circuit, both before and after *Wyatt, supra,* 504 U.S. 158, has consistently held private defendants are not entitled to qualified immunity in section 1983 actions. (See *Conner* v. *City of Santa Ana* (9th Cir. 1990) 897 F.2d 1487, 1492, fn. 9 ; *F.E. Trotter, Inc.* v. *Watkins* (9th Cir. 1989) 869 F.2d 1312, 1318-1319; *Benigni* v. *City of Hemet* (9th Cir. 1988) 879 F.2d 473, 479-480; *Howerton* v. *Gabica* (9th Cir. 1983) 708 F.2d 380, 385, fn. 10 [73 A.L.R.Fed. 70].) While we commonly follow Ninth Circuit opinions as persuasive authority, in this instance we respectfully disagree with the court's apparent blanket position that qualified immunity does not shield private defendants from section 1983 liability.

Our holding makes it unnecessary to consider Dr. Bradley's argument his section 1983 claims did not accrue until he permanently relinquished his medical license.

constitutional provision. (*Bonner* v. *City of Santa Ana* (1996) 45 Cal.App.4th 1465, 1476 [53 Cal.Rptr.2d 671]; see also *Gates* v. *Superior Court* (1995) 32 Cal.App.4th 481, 516-525 [38 Cal.Rptr.2d 489].)

DISPOSITION

The judgment is affirmed. Dr. Bradley to pay defendants' costs on appeal.

Huffman, J., and McDonald, J., concurred.