[No. D033817. Fourth Dist., Div. One. Sept. 13, 2000.]

CARLSBAD AQUAFARM, INC., Plaintiff and Respondent, v. STATE DEPARTMENT OF HEALTH SERVICES, Defendant and Appellant.

COUNSEL

Bill Lockyer, Attorney General, Pam Smith-Steward, Chief Assistant Attorney General, Margaret A. Rodda, Assistant Attorney General,

Kristin G. Hogue and William A. Buess, Deputy Attorneys General, for Defendant and Appellant.

Law Offices of Jeffrey S. Young, Jeffrey S. Young and Thomas Daniel Platt for Plaintiff and Respondent.

## OPINION

**HALLER, J.**—Carlsbad Aquafarm, Inc. (Aquafarm) sued the State Department of Health Services (Department), alleging Department violated Aquafarm's due process rights by refusing to provide notice or a hearing before it failed to recertify Aquafarm to a list of approved interstate shellfish sellers. The jury found Aquafarm proved the due process violation, and awarded it damages of $290,000. Department appeals, asserting an argument it repeatedly made below: Aquafarm is not entitled to recover monetary damages based solely on the state Constitution's due process provision. (Cal. Const., art. I, § 7.) For the reasons explained below, we agree and reverse.

### FACTS

Under well-settled appellate rules, we state the facts in the light most favorable to Aquafarm.

#### Background

Aquafarm harvests mussels for commercial sale at its facilities at Agua Hedionda Lagoon in Carlsbad. Because of bacteria levels in the lagoon, Aquafarm must specially clean the mussels in a process known as "depuration." During depuration, the mussels are placed in tanks and held under sterilized running seawater to purge the bacteria.

Aquafarm sells its mussels to California and out-of-state customers. Two different regulatory systems govern each type of sale.

First, the California Legislature has enacted a comprehensive statutory scheme to protect public health by establishing uniform sanitation standards for shellfish intended for human consumption. (Health & Saf. Code,[1] § 112150 et seq.) Under this scheme, a shellfish operator may not sell its product within the state unless it obtains a certificate issued by Department, known as a "Shellfish Handling Marketing Certificate" (referred to here as

---

[1]All further references are to the Health and Safety Code unless otherwise specified.

an Intrastate Certificate). (§ 112170, subd. (b).) An operator such as Aquafarm must also obtain a permit known as a "Mussel Depuration Process," which sets forth the operator's required depuration procedures. Section 112180, subdivision (e), provides that "[n]o revocation, suspension . . . or withdrawal of any certificate is lawful unless, prior to the institution of [D]epartment proceedings, the [D]epartment gave notice by mail, to the certificate holder, of facts or conduct that warrants the intended action, and the certificate holder was given an opportunity to show compliance with all lawful requirements for the retention of the certificate . . . ."

To sell its product outside California, a shellfish operator is additionally subject to a national certification program. This program is administered by a nationwide committee composed of industry representatives, state regulatory officials, and federal Food and Drug Administration (FDA) officials. The committee publishes standards, known as the National Shellfish Sanitation Program (NSSP). Each state is responsible for determining whether its shellfish operators are complying with NSSP standards. To do this, the state must complete an FDA form 3038, certifying that the particular shellfish operator is complying with NSSP standards. The state then sends this form to the FDA. The FDA in turn publishes a monthly list of approved operators, known as the "Interstate List." An operator that is not identified on the Interstate List is essentially barred from selling its shellfish in another state.

*Events Leading to Aquafarm's Removal from Interstate List*

Aquafarm began its mussel harvesting and depuration business in approximately 1991. After inspecting Aquafarm's facilities, Department completed a form 3038, and sent the form to the FDA. The FDA added Aquafarm to the Interstate List. Department also issued an Intrastate Certificate to Aquafarm, and approved Aquafarm's Mussel Depuration Process.

After these initial certifications, routine inspections uncovered some minor problems with record keeping and compliance with depuration procedures. Aquafarm worked with the state regulators to address these deficiencies. Department continued to issue Aquafarm its annual Intrastate Certificates, and to regularly certify Aquafarm's compliance with NSSP standards by completing a form 3038. During this time, Aquafarm continued to be on the Interstate List, and a majority of its business was with out-of-state customers.

In January 1995, Department held an informal office hearing to resolve some of the continuing disputed issues regarding Aquafarm's depuration procedures.

In April 1995, Aquafarm sought to amend its mussel depuration process to permit it to better comply with NSSP standards. Department denied the request, and in response to Aquafarm's inquiry, stated that Aquafarm could appeal under the Administrative Procedure Act procedures. (Gov. Code, § 11500 et seq.) Although Aquafarm initiated this appeals process, Department did not file the appropriate papers or schedule a hearing for a substantial period of time.

One year later, on March 6, 1996, Department conducted an annual certification inspection and found Aquafarm was violating NSSP standards. Based on that inspection, Department decided to reissue an Intrastate Certificate, but not to complete a form 3038. Because FDA did not receive the form 3038 in March 1996, it removed Aquafarm from the Interstate List beginning in April 1996. Although Aquafarm initially continued to ship mussels to out-of-state customers, these customers soon refused to receive the product because of "pressure" from regulators in their states.

Department first notified Aquafarm of its determination not to complete a form 3038 on April 4, 1996. Department denied Aquafarm's request for a hearing on the matter. Department officials took the position that Aquafarm had no statutory or due process rights to a hearing with respect to the form 3038 certification.

During the next several months, Department reinspected Aquafarm, but repeatedly found Aquafarm was not complying with NSSP standards and therefore refused to issue a form 3038.

In October 1996, Department took action to revoke Aquafarm's Intrastate Certificate. Under the governing Administrative Procedures Act sections, the Attorney General filed an accusation and statement of issues against Aquafarm, which triggered procedures leading to a hearing on the merits of the intended revocation. (Gov. Code, § 11503.) During this time, Aquafarm was permitted to continue selling its product within California.

*Civil Action*

In June 1997, 14 months after it was removed from the Interstate List, Aquafarm filed a superior court complaint against Department and several Department employees, seeking to recover the profits it would have earned from out-of-state customers if it had continued to be on the Interstate List. As amended, the complaint alleged three causes of action: (1) violation of Aquafarm's state constitutional due process rights; (2) intentional interference with prospective economic advantage; and (3) violation of section 112180, subdivision (e).

In response to defendants' demurrer, Aquafarm conceded its intentional interference claim was without merit "based on [Civil Code] section 47 and *Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376 [45 Cal.Rptr.2d 436, 902 P.2d 740]." The court thus sustained the demurrer on this claim, but overruled the demurrer with respect to Aquafarm's due process and statutory claims.

Meanwhile, the administrative hearing procedures relating to the Intrastate Certificate continued. Ultimately, in August 1997, Department and Aquafarm reached a settlement, resulting in Department making several concessions with respect to the validity of Aquafarm's operating procedures. After the settlement, Department completed a form 3038, and sent the form to the FDA. In November 1997, Aquafarm was reinstated to the Interstate List.

In March 1998, Department moved for summary judgment on the two remaining claims in the superior court action (state Constitution due process claim and § 112180 claim). The court granted summary judgment on the statutory claim, ruling that section 112180 does not create a private right of action for money damages. But the court denied summary judgment on the due process claim, finding "there are triable issues of material fact concerning whether plaintiff had any alternative avenues for remedy . . . ."

The trial date was set for March 26, 1999. On January 26, 1999, Aquafarm moved to amend its complaint to add a federal civil rights claim. (42 U.S.C. § 1983.) Aquafarm submitted its counsel's declaration, stating that in preparing for a September 1998 motion, he "learned" that attorney fees are available to prevailing parties under federal law for state due process violations, and the court should therefore permit Aquafarm to "add a federal due process violation cause of action . . . [which] . . . essentially mirrors the state due process claim . . . ." Department opposed the motion, arguing the claim was barred by the one-year limitations period and the added claim would inject new issues, such as punitive damages, prejudicing defendants. The court denied Aquafarm's request to amend the complaint, finding it was untimely. Aquafarm then dismissed its claims against the individual defendants.

At trial, the only claim presented to the jury was Aquafarm's state Constitution due process claim against Department. Aquafarm argued that Department violated its due process rights by failing to give notice and opportunity for a hearing before Department decided not to complete the form 3038. Counsel argued predeprivation procedures were particularly appropriate in this case because the state conceded there was no public

health issue by continuing to permit Aquafarm to sell mussels in California. Aquafarm's theory was that Department recognized that it could not revoke the Intrastate Certificate unless Aquafarm was first provided with notice and a hearing, and therefore Department was attempting to use the form 3038 procedure to force Aquafarm to make changes in its depuration processes that would not have been justified if reviewed by a neutral decision maker.

Department defended by arguing that it could not have provided Aquafarm with a prior hearing because it would have committed perjury if it had completed a form 3038 after determining Aquafarm was not complying with NSSP standards. Department alternatively argued that it provided Aquafarm with due process by giving Aquafarm repeated prior warnings that if it did not remedy its deficiencies Department would not continue to complete the form 3038.

The jury found in Aquafarm's favor and awarded it $290,000, reflecting lost profits while Aquafarm was not on the Interstate List (April 1996 through November 1997).

## DISCUSSION

Department contends the trial court erred in permitting the jury to award monetary damages based solely on the state Constitution's due process provision. As reflected in the parties' briefs, the governing law on this issue is not well settled.

For many years, federal and state courts have grappled with the issue of whether a party may obtain damages based solely on a violation of a constitutional provision without any enabling legislation. (See generally Friesen, State Constitutional Law: Litigating Individual Rights, Claims, and Defenses (2d ed. 1996) pp. 407-456.) Because California courts have sometimes looked to federal decisions in determining the existence and scope of a "constitutional tort," we first briefly summarize the approach taken by the United States Supreme Court. We then set forth the factors that our state courts have considered significant in the state constitutional analysis. We next apply those factors to this case, and conclude Aquafarm was not entitled to recover damages under this state's due process clause.

In 1971, the United States Supreme Court first recognized the concept of a constitutional damages claim. (*Bivens v. Six Unknown Fed. Narcotics Agents* (1971) 403 U.S. 388 [91 S.Ct. 1999, 29 L.Ed.2d 619] (*Bivens*); see Nichol, *Bivens, Chilicky, and Constitutional Damages Claims* (1989) 75 Va. L.Rev. 1117, 118-119.) *Bivens* held the victim of a Fourth Amendment

violation by federal officers acting under color of their authority may bring suit for money damages against the officers in federal court. *(Bivens, supra,* 403 U.S. at pp. 390-397 [91 S.Ct. at pp. 2001-2005].) The court reasoned that although the Fourth Amendment does not expressly provide for an award of money damages, " 'where legal rights have been invaded . . . federal courts may use any available remedy to make good the wrong done.' " *(Id.* at p. 396 [91 S.Ct. at p. 2004].)

Following *Bivens,* the United States Supreme Court upheld a plaintiff's right to sue for damages for a violation of the equal protection component of the federal due process provision where no other remedy was available *(Davis v. Passman* (1979) 442 U.S. 228 [99 S.Ct. 2264, 60 L.Ed.2d 846]) and for a violation of the prohibition against cruel and unusual punishment, even if the plaintiff could also recover monetary damages under a federal statute *(Carlson v. Green* (1980) 446 U.S. 14 [100 S.Ct. 1468, 64 L.Ed.2d 15]). More recently, however, the court has "responded cautiously to suggestions that *Bivens* remedies be extended into new contexts." *(Schweiker v. Chilicky* (1988) 487 U.S. 412, 421 [108 S.Ct. 2460, 2467, 101 L.Ed.2d 370].) Emphasizing separation of powers principles and deferring to legislative authority to devise appropriate remedies, the United States Supreme Court has declined to recognize a right to damages for alleged due process violations resulting in wrongful deprivation of social security benefits *(id.* at p. 414 [108 S.Ct. at p. 2463]), violations of a federal employee's first amendment rights *(Bush v. Lucas* (1983) 462 U.S. 367, 368 [103 S.Ct. 2404, 2406, 76 L.Ed.2d 648]), and violations of constitutional rights involving the military *(Chappell v. Wallace* (1983) 462 U.S. 296, 305 [103 S.Ct. 2362, 2368, 76 L.Ed.2d 586]).

As with the United States Supreme Court, courts in this state have recognized that certain state constitutional provisions support a constitutional tort cause of action and that other provisions do not warrant this type of remedy. (See *Gay Law Students Assn. v. Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458, 475 [156 Cal.Rptr. 14, 595 P.2d 592]; *Bonner v. City of Santa Ana* (1996) 45 Cal.App.4th 1465, 1471-1476 [53 Cal.Rptr.2d 671] *(Bonner);* *Gates v. Superior Court* (1995) 32 Cal.App.4th 481, 516-525 [38 Cal.Rptr.2d 489] *(Gates); Leger v. Stockton Unified School Dist.* (1988) 202 Cal.App.3d 1448, 1453-1458 [249 Cal.Rptr. 688] *(Leger); Laguna Publishing Co. v. Golden Rain Foundation* (1982) 131 Cal.App.3d 816, 848-854 [182 Cal.Rptr. 813] *(Laguna Publishing); Porten v. University of San Francisco* (1976) 64 Cal.App.3d 825, 829-830 [134 Cal.Rptr. 839]; *Melvin v. Reid* (1931) 112 Cal.App. 285, 291-292 [297 P. 91].) Unfortunately, there is no single rationale underlying these decisions and the principles enunciated are often

contradictory. ■ On reviewing these decisions, we believe the issue of whether to recognize a state constitutional tort is essentially one of policy and is dependent on numerous factors, including (1) the voters' intent in permitting monetary damages for a violation of the particular constitutional provision, (2) the availability of another remedy; (3) the extent to which the provision is "self-executing" and the judicial manageability of the tort; and (4) the importance of the constitutional right. ■ Applying appropriate weight to each of these factors, we conclude Aquafarm was not entitled to recover money damages for the state's violation of its due process rights.[2]

■ The most significant factor in California constitutional tort analysis is the voters' intent underlying the particular constitutional provision. (See *White v. Davis* (1975) 13 Cal.3d 757, 775 [120 Cal.Rptr. 94, 533 P.2d 222]; *Gates, supra,* 32 Cal.App.4th at pp. 517-518.) Courts have "permitted the imposition of damages for a violation of a provision of the California Constitution when the voters have intended" this result. (*Ibid.*)

■ Our state Constitution's due process provision is contained in article I, section 7, and provides "A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws . . . ." This provision does not expressly allow for a damages action. Further, there is no evidence the voters intended to allow this type of an action. As recently explained, this provision was added to the state constitution through Proposition 7 on the November 1974 ballot. (See *Gates, supra,* 32 Cal.App.4th at pp. 522-524.) The accompanying voter pamphlet stated: "The proposition puts the following three rights into the State Constitution. These rights presently are contained in the federal Constitution. [¶] (a) The Legislature shall make no law respecting the establishment of religion. [¶] (b) A person may not be deprived of life, liberty, or property without due process of the law. [¶] (c) A person may not be denied equal protection of the laws." (Ballot Pamp., Gen. Elec. (Nov. 5, 1974) Proposed Amends to Cal. Const. with arguments to voters, p. 26.)

The *Gates* court exhaustively analyzed these explanatory statements and other voting materials, and found the voters did not intend to create a damages remedy with respect to California Constitution, article I, section 7's

---

[2]We assume for purposes of this appeal that the jury properly found Department did in fact violate Aquafarm's state constitutional due process rights. Although we have some concerns with the correctness of the due process jury instructions and the sufficiency of the evidence to support some of the requisite elements of the claim, Department does not raise these issues on appeal.

equal protection clause. (*Gates, supra*, 32 Cal.App.4th at pp. 522-524.) The court therefore held the plaintiffs could not bring a state constitutional equal protection claim against the police department and police officials for alleged discriminatory deployment of police resources during the 1992 Los Angeles riots.

We similarly find there is nothing in the 1974 voter materials from which we can reasonably infer the voters intended to provide for a damages remedy for procedural due process violations. To the contrary, the voter pamphlet's statement that the proposition "does not increase government costs," suggests that the voters would not have realized they were creating a new damages remedy against the government. (See *Gates, supra*, 32 Cal.App.4th at p. 524.)

Aquafarm urges us to reach a different conclusion, relying on *Bonner, supra,* 45 Cal.App.4th 1465, which construed the same ballot materials to conclude that although it agreed with *Gates* with respect to the equal protection clause, it found the 1974 voters had a different intent with respect to the due process clause.

In *Bonner*, a homeless person brought an action for money damages against the city, alleging he was deprived of his rights under the state Constitution's equal protection and due process provisions when a city worker threw away a bag containing his possessions. (*Bonner, supra*, 45 Cal.App.4th at p. 1468.) Agreeing with *Gates*'s voter intent analysis, the *Bonner* court held the plaintiff could not recover damages for his claimed equal protection violation. (*Id.* at pp. 1472-1473.) But the court distinguished the voters' intent with respect to the state's due process provision. (*Id.* at pp. 1473-1476.) In so doing, the court focused on the November 1974 voter pamphlet's statement that the proposition adds "three rights" (including due process and equal protection) that are " '*presently . . . contained in the Federal Constitution.*' " (*Id.* at p. 1474, italics in original.) Based on these statements, the *Bonner* court said that because the United States Supreme Court in *Davis v. Passman, supra,* 442 U.S. 228, had permitted a damages remedy for a federal due process violation in a situation where there was no other remedy, it could "safely conclude" the California voters had intended to permit a damages remedy for a due process violation where there is no "judicial alternative." (*Bonner, supra*, 45 Cal.App.4th at pp. 1474-1475.) Applying this rationale, the court concluded the plaintiff did not have a damages remedy for a due process violation because he had a nonconstitutional remedy—the tort of conversion. (*Id.* at pp. 1475-1476.) Because the

plaintiff had an "effective" judicial alternative, the court declined to reach the issue of whether the action would be barred if the judicial alternative was not an "effective" remedy. (*Id.* at p. 1475.)

Our problems with *Bonner*'s analysis as applied to this case are several. First, *Davis v. Passman, supra,* 442 U.S. 228, and the subsequent United States Supreme Court authority relied upon by *Bonner* were decided *after* Proposition 7's adoption by the voters. It is not reasonable to infer from the single statement in the voter's pamphlet that the voters would have predicted the United States Supreme Court's extension of *Bivens* to a procedural due process claim. Second, the language in the voter pamphlet relied upon by the *Bonner* court states only that Proposition 7 puts "rights" into the state Constitution that " 'presently are contained in the Federal Constitution.' " (*Bonner, supra,* 45 Cal.App.4th at p. 1474, italics omitted.) This statement does not necessarily mean the voters would have understood they were adopting the analysis of the United States Supreme Court with respect to the existence of a damages remedy pertaining to those rights. Third, and perhaps most important, *Davis v. Passman* was not a procedural due process claim as is presented here. In *Davis v. Passman,* a former congressional staff member alleged her federal equal protection rights were violated when her boss, a former United States congressperson, discriminated against her based on her gender. (*Davis v. Passman, supra,* 442 U.S. at pp. 234-236 [99 S.Ct. at pp. 2271-2272].) At that time, the plaintiff was not covered under title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) or internal congressional administrative rules. Relying on *Bivens,* the high court held a damages remedy was appropriate in the case because there were no other available remedies. (*Davis,* at pp. 245-248 [99 S.Ct. at pp. 2277-2279].) The *Davis v. Passman* holding, therefore, is closer to *Gates*—an equal protection case—than it is to *Bonner* and to this case, which raise *procedural* due process claims.

Thus, we cannot accept *Bonner*'s conclusion, based on the Proposition 7 ballot materials and the subsequently decided *Davis v. Passman* decision, that although California voters did not intend to create a damages remedy for a state equal protection violation, they must have intended to permit a damages claim for a state due process violation whenever a plaintiff has no "alternative" remedy. Instead, we conclude there is no evidence the voters specifically intended to create a damages remedy for a violation of the California Constitution's due process clause.

But does the absence of explicit voter intent to create a damages remedy for a particular constitutional provision mean that a damages remedy may

never be inferred? While this appears to be the *Gates* majority's conclusion, we do not believe the analysis is so simple. In *Gay Law Students Assn. v. Pacific Tel. & Tel. Co., supra,* 24 Cal.3d 458, the California Supreme Court permitted an action based directly on the state's equal protection constitutional provision. (*Id.* at p. 473; see Friesen, State Constitutional Law: Litigating Individual Rights, Claims and Defenses, *supra,* § 7-7(a)(2), pp. 428-429.) *Gates* failed to explain how its categorical holding that damages may never be recovered under the state equal protection clause is consistent with this California Supreme Court authority. Moreover, several other courts have upheld damage remedies under different constitutional provisions without a specific finding of voter intent to support the existence of these remedies. (See *Fenton v. Groveland Community Services Dist.* (1982) 135 Cal.App.3d 797, 804 [185 Cal.Rptr. 758]; *Laguna Publishing, supra,* 131 Cal.App.3d at pp. 848-854.) Although *Gates* dismissed these cases as being wrongly decided because the courts failed to properly premise their holdings on the voters' intent (*Gates, supra,* 32 Cal.App.4th at p. 525, fn. 16), we are not persuaded these decisions can be so easily rejected.

Instead of relying only on decisions that support a single rationale, we believe it more helpful to attempt to harmonize the various decisions. In so doing, we conclude that although voters' intent is the fundamental factor in California's state constitutional tort analysis, other factors may also be relevant. For example, California courts have sometimes permitted a state constitutional remedy because there are no other available remedies.[3] This appears to have been a factor motivating the court's holding in *Gay Law Students Assn. v. Pacific Tel. & Tel. Co., supra,* 24 Cal.3d 458, where individuals and groups sued a public utility, alleging the utility discriminated against homosexuals in employment decisions. (*Id.* at pp. 463-464.) The plaintiffs sought declaratory and injunctive relief, and sought monetary damages to compensate for losses sustained as a result of past discrimination. (*Id.* at pp. 465-466.) Although the court did not specifically discuss the damages issue, the court concluded that "plaintiffs' complaint state[d] a cause of action . . . under article I section 7, subdivision (a) of the California Constitution," citing the portion of *Bivens* where the court upheld the plaintiff's right to recover money damages for the constitutional violation. (*Id.* at p. 475; see *Bivens, supra,* 403 U.S. at pp. 390-397 [91 S.Ct. at pp. 2001-2005].) In so concluding, the California Supreme Court stressed that the state's then existing antidiscrimination laws did not "encompass discrimination against homosexuals" and therefore a "direct court action" was

---

[3]Although this factor coincides with *Bonner*'s ultimate conclusion, we disagree with *Bonner*'s analysis in determining why this factor is relevant. The difference in analysis is important because it is the basis for determining the meaning and scope of this "no alternate remedy" factor.

appropriate because the plaintiffs did not have an administrative remedy governed by that act. (*Gay Law Students Assn. v. Pacific Tel. & Tel. Co., supra,* 24 Cal.3d at p. 475, fn. 10.)

We thus agree conceptually with Aquafarm that the lack of any alternate remedy may be a factor supporting the existence of a constitutional tort, even absent explicit voter intent. This factor, however, is of no help to Aquafarm in this case because Aquafarm had an alternative remedy. Under Code of Civil Procedure section 1085, Aquafarm could have immediately petitioned the superior court for a writ of mandate ordering Department to provide it with due process before it refused to reissue a form 3038. (See *Aylward v. State Board etc. Examiners* (1948) 31 Cal.2d 833, 838 [192 P.2d 929]; *Bergeron v. Desert Hospital Corp.* (1990) 221 Cal.App.3d 146, 150-153 [270 Cal.Rptr. 397]; *Fidelity & Cas. Co. of New York v. Workers' Comp. Appeals Bd.* (1980) 103 Cal.App.3d 1001 [163 Cal.Rptr. 339].) The essence of Aquafarm's due process claim was that it wanted a hearing to permit a neutral decision maker to determine whether Department was correct in its determination that it had not complied with NSSP standards. If Aquafarm had promptly filed for a writ of mandate, rather than waiting 14 months to file a civil complaint seeking compensatory damages, it could have achieved this desired objective.[4]

Aquafarm argues that the mandamus remedy was not an "effective judicial alternative" within the meaning of the *Bivens* line of cases because it could not obtain monetary relief in a mandamus action. (See *Carlson v. Green, supra,* 446 U.S. at pp. 18-23 [100 S.Ct. at pp. 1471-1474].) This argument fails. First, California courts have not necessarily followed the *Bivens* line of cases with respect to determining the existence and/or scope of a state constitutional tort. Second, even if we were to apply the *Bivens* line of cases, the United States Supreme Court has more recently recognized that a *Bivens* remedy may not be appropriate even if the judicial alternative would not afford complete relief to the plaintiff. (See *Schweiker v. Chilicky, supra,* 487 U.S. at pp. 421-429 [108 S.Ct. at pp. 2466-2471]; see also *Shields v. Gerhart* (1995) 163 Vt. 219 [658 A.2d 924, 932] [the United States Supreme Court has "apparently abandoned its requirement of an 'equally effective alternative remedy' in order to obviate the need for a damages remedy"].) Focusing on separation of powers principles, the *Schweiker* court stated that "[w]hen

---

[4]We agree with Aquafarm that a writ of administrative mandate under Code of Civil Procedure section 1094.5 would not have been appropriate because a hearing was never conducted. (See *Bunnett v. Regents of University of California* (1995) 35 Cal.App.4th 843, 848 [41 Cal.Rptr.2d 567].) But we fail to see the relevance of this argument because Aquafarm was entitled to bring a traditional mandate action under Code of Civil Procedure section 1085.

the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies." (*Schweiker v. Chilicky, supra,* 487 U.S. at p. 423 [108 S.Ct. at p. 2468].) In this case, the Legislature has provided a remedy for the due process violation alleged here—mandamus procedures to obtain the desired administrative hearing—without specifically authorizing a monetary damages remedy. We thus infer the Legislature has concluded this remedy is sufficient, and we do not believe it is the role of the judiciary to create a damages action merely to provide a more "complete" remedy.

Moreover, Aquafarm did have an equally effective monetary remedy—a federal 42 United States Code section 1983 action against the individual Department employees. Aquafarm's federal civil rights claim was not permitted because it was untimely. The fact that Aquafarm failed to bring this claim in a timely fashion does not justify this court in creating a new species of constitutional tort.

A third factor traditionally relied upon by California courts in determining whether to permit a constitutional tort is the extent to which the constitutional provision is self-executing. (See *Leger, supra,* 202 Cal.App.3d at pp. 1454-1455.) While we agree with the authorities that this factor is difficult to apply (see *Bonner, supra,* 45 Cal.App.4th at pp. 1471-1472), the self-executing analysis is helpful in the sense that it focuses a court's attention on the extent to which a constitutional provision includes "guidelines, mechanisms, or procedures from which a damages remedy could be inferred." (*Leger, supra,* 202 Cal.App.3d at p. 1455.) Where these express or implied guidelines are absent and permitting compensatory relief would be impractical, the constitutional provision may be inappropriate to support a damages remedy.

This factor militates against permitting a damages action here. The due process provision reflects general principles " ' "without laying down rules by means of which those principles may be given the force of law." ' " (See *Leger, supra,* 202 Cal.App.3d at p. 1455.) Further, permitting a "procedural due process" tort raises a host of practical problems. There are substantial inherent difficulties in proving a party's damages resulted from the denial of a hearing, particularly where, as here, the government agency and the administrative hearing officer had substantial discretion in ruling on the merits of the issue. This problem certainly manifested in this case. Although the jury was instructed it must find the due process violation "caused"

Aquafarm's claimed lost profit damages, there was little or no evidence linking the *absence of a hearing* to the ultimate damages. Instead, Aquafarm focused primarily on arguing that it suffered damages because it was removed from the Interstate List. During closing argument, Aquafarm's counsel said "[w]e have to prove that the denial of due process caused [Aquafarm] the economic damages, and the simplest way for me to explain that to you is, [Aquafarm] was not on the [Interstate] list, and [Aquafarm] lost money because of that, and [Aquafarm] was taken off the [Interstate] list very quickly, because due process wasn't followed, and that's what caused the damage." This argument did not reflect the requisite causation. It was not—as counsel said—that the jury must find that Aquafarm lost profits because it was removed from the Interstate List. Instead, Aquafarm was required to additionally present substantial evidence that if it had a hearing, it would have convinced the decision maker that the Department should have prepared the form 3038, a decision upon which the agency had considerable discretion.

A final factor considered by the courts in the constitutional tort analysis is the importance of the constitutional right. (See *Fenton v. Groveland Community Services Dist., supra,* 135 Cal.App.3d at p. 804; *Laguna Publishing, supra,* 131 Cal.App.3d at p. 853.) While this factor may be a proper consideration in the overall analysis, it is not one upon which we place great significance. How does one rank the importance of different constitutional provisions? While the courts have emphasized the *special dignity* accorded free speech, free press and voting rights in determining that damages should be allowed under those constitutional provisions (see *Fenton v. Groveland Community Services Dist., supra,* 135 Cal.App.3d at p. 805; *Laguna Publishing, supra,* 131 Cal.App.3d at p. 853), can we say a procedural due process right should be accorded more or less dignity? We agree the due process right is fundamental. But absent the applicability of the other relevant factors discussed here, the relative importance of the constitutional right is of little help in determining the availability of a damages remedy for a violation of that right.

We conclude Aquafarm did not have a right to monetary relief under the procedural due process clause of the California Constitution.[5]

---

[5]This holding is fully consistent with our decision in *Bradley v. Medical Board* (1997) 56 Cal.App.4th 445 [65 Cal.Rptr.2d 483], where we held a doctor was not entitled to recover monetary damages for an alleged violation of his state constitutional due process rights during an administrative investigation. Although the *Bradley* court cited the *Bonner* and *Gates*

## DISPOSITION

Judgment reversed, with directions to enter judgment in favor of Department. Each party to bear its own costs on appeal.

Work, Acting P. J., and O'Rourke, J., concurred.

A petition for a rehearing was denied October 3, 2000, and respondent's petition for review by the Supreme Court was denied November 29, 2000.

---

decisions, we did not expressly analyze the issue, nor state that we agreed with the reasoning of those decisions.