[No. G012674. Fourth Dist., Div. Three. May 31, 1996.]

MARSHONE BONNER, Plaintiff and Appellant, v.
CITY OF SANTA ANA, Defendant and Appellant.

## COUNSEL

Christopher B. Mears, Snell & Wilmer, Richard A. Derevan and Sean M. Sherlock for Plaintiff and Appellant.

Edward J. Cooper, City Attorney, and Robert J. Wheeler, Assistant City Attorney, for Defendant and Appellant.

## OPINION

### SILLS, P. J.—

#### BACKGROUND

Marshone Bonner kept all of his worldly goods in a trash bag. He stored the bag behind some bushes near city hall. When city workers tossed the bag into the trash, Bonner might have sued the city for conversion. (See *Collin* v. *American Empire Ins. Co.* (1994) 21 Cal.App.4th 787, 812 [26 Cal.Rptr.2d 391] ["The tort of conversion is an 'act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein.' "].) A city is, after all, not immune from conversion claims. (See *Tallmadge* v. *County of Los Angeles* (1987) 191 Cal.App.3d 251, 254 [236 Cal.Rptr. 338] [county could be held liable on conversion theory for destruction of confiscated firearms without prior notice]; *Kane* v. *County of San Diego* (1969) 2 Cal.App.3d 550, 552-553 [83 Cal.Rptr. 19] [county held liable on conversion theory for immediate destruction of 28 greyhound dogs taken to animal shelter because county should have waited 72 hours].)

In point of fact, Bonner *did* sue the city for conversion, but, for some reason, dismissed his conversion claim prior to trial. Instead, he sought damages based strictly on the violation of two state *constitutional* provisions: He claimed the city, by tossing his bag into the trash, denied him both equal protection of the laws and due process of law. (See Cal. Const., art. I, § 7.)

Bonner prevailed on these two causes of action. A jury awarded him $9,300: $1,300 for the contents of the bag, $8,000 for the emotional distress of losing it. The city then appealed.

In a prior opinion, we held that Bonner could not prevail as a matter of law on his equal protection claim, because money damages are not available for equal protection violations. Nevertheless, we also held that Bonner could prevail on his due process claim, but was limited, like any other owner whose property is taken by the government, to just the value of the property; he could not recover for his emotional distress.

We remanded the case because of a problem with one of the jury instructions. Bonner's due process claim required proof that the destruction of his property was city policy, as distinct from, say, simple negligence. The trial court had given an instruction which had precluded the jury from considering the evidence presented by the city that it did not have such a policy. Bonner then petitioned the California Supreme Court for review; it granted

review and transferred the matter back to this court, concluding that our previous decision had rested on grounds not briefed by the parties.[1] The interim has afforded us not only an opportunity to consider the arguments of the parties specifically targeted at the rationales set forth in our prior opinion, but also to consider an important new case in the area, *Gates* v. *Superior Court* (1995) 32 Cal.App.4th 481 [38 Cal.Rptr.2d 489], a decision arising out of the mob violence that occurred in Los Angeles in April 1992. *Gates* squarely holds, as did we in our earlier opinion, that money damages are not available for violations of the state equal protection clause. Bonner tries to distinguish *Gates* on the ground that the alleged equal protection violation in that case involved government *in*action, while the violation here involved affirmative *mis*action. The distinction, as we will later explain, is unconvincing.

As to the due process violation, we have also (at the city's remonstrance) taken the *Gates* decision to heart. *Gates* demonstrated that in construing our state Constitution, the California Supreme Court has mandated that courts look to the intent of the voters who ratified the document. And when we do, we find we must reappraise our previous determination that Bonner could obtain money damages for a violation of the state due process clause.

In particular, in 1974, the voters were told that in enacting the due process clause into our state Constitution, they were etching into stone rights *already* present in the federal Constitution. As it turns out, the federal Constitution does allow causes of action for violations of the due process clause—but not when there is an effective alternative judicial remedy. That cannot be said here, where, as related above, Bonner had the right to sue the city for conversion.

## FACTS

Our statement of the basic facts of the case remains the same as our earlier opinion:

Marshone Bonner was homeless and kept his worldly goods in a large garbage bag weighing about 50 pounds. He stored the bag behind some bushes against the wall of a building in the Santa Ana civic center. The bag could not be seen from the walkway going past the property. Other bags owned by homeless persons were also stored in the area.

One morning in late July 1989 city workers loaded the bags from the area onto a truck and drove off. The next day an unidentified city worker told

---

[1] That, at least, would appear to be the import of a grant and transfer order containing a reference to Government Code section 68081.

Bonner he had taken the bags to the dump. Bonner never saw his property again.

In May 1990, Bonner sued the City of Santa Ana for the loss of his property. While his complaint originally listed five causes of action, including the tort of conversion, he dismissed three of the five at or by the time the case came to trial in March 1992. The two remaining causes of action were, respectively, violations of the due process and equal protection clauses of our state Constitution.[2] There were no traditional tort causes of action.[3]

At trial the parties presented conflicting evidence as to whether the city had adopted a policy of destroying the property of homeless persons. Bonner presented a memorandum written by the city's executive director of recreation and community services stating the city council had "developed a policy that the vagrants are no longer welcome in the City of Santa Ana." The memo then mentioned that a special city task force would have the "mission" of "continually removing" the "paraphernalia" of vagrants "from the places they are frequenting in the City." On the other hand, the city manager, the mayor, and the city attorney all testified that Santa Ana had no such policy, and the memo did not accurately reflect city policy.

The trial court gave three "respondeat superior" instructions to the jury. The first simply told the jury that the city's employees were its agents. (See BAJI No. 13.00.) The second told the jury that the conduct of an agent need not be "expressly authorized" by a principal for it to be within the scope of the agent's employment. Conduct which is "reasonably necessary for the performance of an authorized act" is within the scope of such employment. (See BAJI No. 13.01.) The final instruction declared it was "established that the city council and city employees were the agents" of the city, and "[t]herefore" any act of these "agents was in law the act" of the city. (See BAJI No. 13.04.) The court also refused an instruction proffered by the city that it could be found liable for a violation of Bonner's constitutional rights "only" if its own acts caused the violation.[4]

The special verdict used by the jury consisted of three questions: First, did the city violate Bonner's right to either due process or equal protection?

[2]Both clauses are found in article I, section 7 of the California Constitution, which provides in relevant part: "A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws . . . ."

[3]The three causes of action originally pled but later dismissed were (1) violation of statutory duties; (2) conversion; and (3) conspiracy.

[4]The instruction was based on *Monell* v. *New York City Dep. of Social Services* (1978) 436 U.S. 658 [56 L.Ed.2d 611, 98 S.Ct. 2018], which held, among other things, that a local government entity could not be sued under federal civil rights laws (42 U.S.C. § 1983) for injury inflicted "solely by its employees or agents." Rather, the violation of civil rights must "represent official policy." (*Monell, supra,* 436 U.S. at p. 694 [56 L.Ed.2d at p. 638].)

Second, if so, what were his economic damages? Third, what were his "noneconomic" damages?

The jury answered the first question yes, and fixed economic damages at $1,300 and noneconomic damages at $8,000. Bonner also requested an award of attorney fees on the theory his litigation had, in the words of section 1021.5 of the Code of Civil Procedure (the codification of the "private attorney general doctrine"), enforced "an important right affecting the public interest" and thereby "conferred" a "significant benefit" on a "large class of persons." The trial court denied the request.

The city has appealed from the judgment awarding Bonner $9,300. Bonner has cross-appealed from the judgment to the extent it does not provide for attorney fees.

*The Plaintiff Has No Right to Money Damages for Violations of the Equal Protection or Due Process Clauses of the State Constitution*

As we noted in our earlier opinion, the remarkable feature of Bonner's case is that it is limited to a request for *money damages* based *strictly* on violations of state constitutional rights to equal protection and due process. There are no tort claims. There are no federal civil rights claims.

Outside the right to privacy and eminent domain contexts, only a couple of California appellate court opinions have held that there is a right to damages for violations of state constitutional provisions, although neither involved the equal protection or due process clauses. (*Fenton* v. *Groveland Community Services Dist.* (1982) 135 Cal.App.3d 797 [185 Cal.Rptr. 758] [right to vote]; *Laguna Publishing Co.* v. *Golden Rain Foundation* (1982) 131 Cal.App.3d 816 [182 Cal.Rptr. 813] [free press].) These decisions rested on the rationale that the constitutional provisions at issue were self-executing in the sense that they provided a specific method by which they might be enforced. (See *Leger* v. *Stockton Unified School Dist.* (1988) 202 Cal.App.3d 1448, 1455 [249 Cal.Rptr. 688] [self-execution means there is "a specific method" for their enforcement].) In our previous opinion, we discussed the *Fenton* and *Laguna Publishing* decisions at length, and wondered aloud whether they were ultimately reconcilable with *Leger* v. *Stockton Unified School Dist., supra,* 202 Cal.App.3d 1448. *Leger* had refused to allow a cause of action for violation of a provision (right to safe schools) no less self-executing than the provisions which *Fenton* and *Laguna Publishing* had held were self-executing. In any event, we then analyzed the nature of the equal protection clause in the state Constitution and concluded that by no means was *it* self-executing.

After we issued our previous opinion, *Gates* v. *Superior Court*, *supra*, 32 Cal.App.4th 481, pointed out something which we had overlooked: The key issue in deciding whether a state constitutional provision may be enforced by way of an action for money damages is not whether its text may be stretched to make it "self-executing," but whether the *voters who ratified the provision intended* it to be so enforceable. (*Id.* at p. 525, fn. 16.)[5] "The California Supreme Court has consistently required that the Constitution be interpreted so as to give effect to the voters' intentions. [Citations]." (32 Cal.App.4th at p. 518.) Thus, after canvassing the history of the state equal protection clause (see *id.* at pp. 520-524), it was enough for the *Gates* court that there was nothing in the language or history of the clause to afford litigants a right to sue for money damages.[6] The decision did not get bogged in the mysteries of self-execution.

We need not reiterate the history of the state equal protection clause as set forth in *Gates*. In his brief Bonner presents no challenge to *Gates*'s scholarship. He merely suggests that the case can be distinguished because it involved inaction (and thereby implicated fiscal policy) rather than "affirmative government misconduct."

The distinction is unpersuasive because the fundamental insight of the *Gates* decision (and, indeed, the Supreme Court cases which the *Gates*'s court relied on for that insight[7]) is that it is the intent of the enactors which governs, and *intent* is an idea independent of the action-nonaction dichotomy

---

[5]In the case of clearly self-executing provisions, such as article I, section 19 of the California Constitution (which makes a specific reference to compensation), the result would almost invariably be the same, because the *text* of the provision would clearly show how the *voters* intended the provision to be enforced.

[6]*Gates* arose out of the April 1992 Los Angeles riots. The plaintiffs, including Reginald Denny, filed a complaint alleging that the hierarchy of the Los Angeles Police Department deliberately withdrew police services from minority communities; as a result the plaintiffs sustained direct personal injuries when they were attacked by members of a mob. (See *Gates* v. *Superior Court*, *supra*, 32 Cal.App.4th at pp. 490-492.) While much of the opinion discussed Government Code section 845, which affords local governments immunity for failure to provide police services (see *Gates*, *supra*, 32 Cal.App.4th at pp. 494-516), one of the plaintiffs' claims was for money damages for violations of the state equal protection clause.

[7]*Bowens* v. *Superior Court* (1991) 1 Cal.4th 36, 45 & 47 [2 Cal.Rptr.2d 376, 820 P.2d 600] (giving "full effect to the intent of the electorate in passing Proposition 115" and looking to "manifest intent of the voters" in deciding effect of provision on previous case law); *Delaney* v. *Superior Court* (1990) 50 Cal.3d 785, 798-799 [268 Cal.Rptr. 753, 789 P.2d 934] (looking to words of constitutional newspaper shield provision to determine the "lawmakers' intent"); *Mutual Life Ins. Co.* v. *City of Los Angeles* (1990) 50 Cal.3d 402, 407-408 [267 Cal.Rptr. 589, 787 P.2d 996] (plain meaning of constitutional provision providing for tax on insurance company premiums meant there was no need to "resort to indicia" of intent of voters); *Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735, 738-741 & 740, fn. 14 [248 Cal.Rptr. 115, 755 P.2d 299] (after linguistic analysis of vacancy provision in state Constitution, looking to ballot pamphlet to ascertain intent of voters); *In re Lance W.* (1985) 37 Cal.3d 873, 889 [210

on which Bonner relies. If the voters wanted to fashion a constitutional provision which established a specific right to some government "action," and wanted that provision to be enforceable by way of an action for money damages, there is nothing to stop them. Indeed, the action-inaction distinction ignores *Fenton* v. *Groveland Community Service Dist., supra,* 135 Cal.App.3d 797, which involved the right to vote, an enterprise which most certainly does entail a great deal of affirmative governmental conduct.

■ *Gates* is directly on point as to Bonner's equal protection claim. But what about the due process claim? With the exception of our previous opinion in this case, however, it appears no California court had considered the problem of whether the state due process clause can provide a remedy by way of money damages.

While *Gates* did not directly address the question of the voters' intent as to the due process provision, we may begin by noting what the *Gates* court said about article I, section 7 of the California Constitution, which contains the due process as well as the equal protection clause: The clause does not mention the right to personal injury damages. (*Gates* v. *Superior Court, supra,* 32 Cal.App.4th at p. 525.) Just looking at the text, one would not conclude that it allowed for an action for money damages.

But few constitutional provisions are as broad as those which prescribe due process (or equal protection for that matter). No doubt whole forests have disappeared to provide the paper for the volumes that have been written on the nature of those two topics. The text is not so plain or susceptible of only one reasonable interpretation that we may safely end our analysis there. This is one of those instances where looking to sources behind the words to ascertain the intent of the lawmakers is appropriate. (See *J.A. Jones Construction Co.* v. *Superior Court* (1994) 27 Cal.App.4th 1568, 1576-1584 [33 Cal.Rptr.2d 206] [looking to legislative history to illuminate ambiguous statute].)

The state due process clause was enacted in 1974 as part of Proposition 7, which reorganized article I of the state Constitution. While the voter pamphlet sent out for the General Election held November 5, 1974, made no

Cal.Rptr. 631, 694 P.2d 744] ("In construing constitutional and statutory provisions, whether enacted by the Legislature or by initiative, the intent of the enacting body is the paramount consideration."); *Board of Supervisors* v. *Lonergan* (1980) 27 Cal.3d 855, 863 [167 Cal.Rptr. 820, 616 P.2d 802] ("We turn, then, to the language of the enactment, keeping in mind the familiar and basic tenet that constitutional provisions adopted by the people are to be interpreted so as to effectuate the voters' intent."); *Kaiser* v. *Hopkins* (1936) 6 Cal.2d 537, 538 [58 P.2d 1278] (applying " 'general rule of statutory construction that the courts will interpret a measure adopted by vote of the people in such manner as to give effect to the intent of the voters adopting it' " to tax provision in state Constitution); *Miller* v. *Dunn* (1887) 72 Cal. 462, 465 [14 P. 27] ("In determining the office of words used in a constitution, the object is to give effect to the intent of the people adopting it.").

reference to any right to sue for money damages, it did, on page 26, contain this statement by the legislative analyst: "The proposition puts the following three rights into the State Constitution. *These rights presently are contained in the Federal Constitution.*" (Italics added.) (The other two rights were equal protection of the laws and the preclusion of an established religion.) We may thus safely conclude that in passing Proposition 7, the voters intended to put into the state Constitution what was already there in the federal.

In *Davis* v. *Passman* (1979) 442 U.S. 228 [60 L.Ed.2d 846, 99 S.Ct. 2264], the United States Supreme Court held that violations of the *federal* due process could, indeed, be enforced by an action for money damages. We therefore cannot say that an action for money damages under the state due process clause is *categorically* precluded by the holding and analysis in *Gates*. Violations of the state equal protection clause may not be cognizable by means of an independent action for money damages, but, in light of the United States Supreme Court's *Davis* decision, the same cannot *automatically* be said for violations of the state due process clause.[8]

But the *Davis* decision was explicitly predicated on the absence of alternative judicial relief. The case arose out of the discharge of an administrative assistant by a Congressmember because of her sex. She had no federal civil rights action because (at the time) Congress had exempted itself from the federal civil rights laws. Because the Congress member was no longer serving, equitable relief was unavailable. The administrative assistant had no state cause of action. Other than the cause of action for money damages under the federal due process clause, nothing was available. For her, " 'it [was] damages or nothing.' " (442 U.S. at p. 245 [60 L.Ed.2d at p. 863], quoting *Bivans* v. *Six Unknown Fed. Narcotics Agents* (1971) 403 U.S. 388, 410 [29 L.Ed.2d 619, 634-635, 91 S.Ct. 1999] (conc. opn. of Harlan, J.).)

Four years later, *Bush* v. *Lucas* (1983) 462 U.S. 367, 377 [76 L.Ed.2d 648, 656, 103 S.Ct. 2404] reiterated the importance of the absence of a judicial

---

[8]At oral argument, counsel for Bonner challenged the soundness of the *Gates* decision because it did not come to grips with the seeming intent of the voters to incorporate federal case law into the new provisions. At the most, however, Bonner's challenge only shows that there is no categorical prohibition on a money damage remedy for violations of the state equal protection clause *if* the United States Supreme Court allowed such a remedy for federal equal protection violations. Bonner has not, however, cited us to, nor are we aware of, any opinions of the United States Supreme Court allowing such a remedy for equal protection violations. Indeed, of the many constitutional provisions which bear on the subject of individual rights, the equal protection clause is among the *least* suited for enforcement by way of an action for money damages. (See *Rockhouse Mountain Prop.* v. *Town of Conway* (1986) 127 N.H. 593 [503 A.2d 1385, 1388] [because equal protection claims depend on a contrast between the treatment of plaintiff and others similarly situated, there is "virtually no limit to the variety of activities that can provide the context in which an equal protection claim can at least be raised," and therefore such claims have "no exact analogue" in traditional tort law].)

alternative in analyzing a claim for money damages under the federal due process clause. "In reaching the conclusion that an award of damages would be an appropriate remedy [in *Davis*], we emphasized the fact that no other alternative form of judicial relief was available."[9]

We need not explore the degree to which there is a meaningful difference between *any* judicial alternative and, as one might gather from the seminal *Bivans* opinion, an *effective* judicial alternative. (See generally, *Carlson* v. *Green* (1980) 446 U.S. 14 [64 L.Ed.2d 15, 100 S.Ct. 1468].)[10] Even if the test is effective (as distinct from any) judicial alternative, Bonner had one.

The *Carlson* decision was bottomed on the existence of four factors which revealed that a direct constitutional action was the plaintiff's only effective remedy. Those factors were: (1) the specific deterrent purpose in the constitutional action where none existed in the alternative; (2) the possibility of punitive damages in the direct constitutional action not present in the alternative; (3) the possibility of a jury trial for the direct constitutional action but not the alternative; and (4) the fostering of nationwide uniformity afforded by a direct constitutional action but not the alternative. (See *Carlson* v. *Green*, *supra*, 446 U.S. at pp. 20-23 [64 L.Ed.2d at pp. 24-27].)

Of these four factors favoring a direct constitutional action, (1), (3), and (4) are distinctly not present here. The traditional tort remedy of conversion action fits the wrong involved in this case—tossing someone's belongings in the trash—much better than the relatively amorphous due process clause.

---

[9]*Bush* involved a NASA employee who was demoted for making some uncomplimentary statements about the agency. The court held that he did not have a nonstatutory remedy for the violation of his free speech rights because his employment with the government was governed by "comprehensive procedural and substantive provisions" affording him meaningful remedies. (See *Bush* v. *Lucas*, *supra*, 462 U.S. at p. 368 [76 L.Ed.2d at p. 651].)

[10]As Justice Harlan's concurring, Chief Justice Burger's dissenting, Justice Black's dissenting, Justice Blackmun's dissenting, and the later *Bush* opinion all indicated, *Bivans* was fundamentally predicated on the absence of an *effective* judicial alternative. (See *Bivans* v. *Six Unknown Fed. Narcotics Agents*, *supra*, 403 U.S. at pp. 409-410 [29 L.Ed.2d at pp. 634-635] (conc. opn. of Harlan, J.) [concurring because "some form of damages" was needed to give the plaintiff a "possible remedy" and "[f]or people in Bivans' shoes, it is damages or nothing"]; *id.* at pp. 411-424 [29 L.Ed.2d at pp. 635-643] (dis. opn of Burger, C. J.) [general discussion of the inadequacy of the exclusionary rule as remedy for search and seizure violations]; *id.* at pp. 427-429 [29 L.Ed.2d at pp. 644-646] (dis. opn. of Black, J.) [making point that because Congress had *not* afforded a remedy against federal officials acting under color of federal law for Fourth Amendment violations, but had done so against state officials acting under state law, Congress did not desire such actions against federal officials]; *id.* at p. 430 (dis. opn. of Blackmun, J.) [arguing that if "other quite adequate remedies" were not available, it was for Congress, not court, to create them]; *Bush* v. *Lucas*, *supra*, 462 U.S. at pp. 375 and 377 [76 L.Ed.2d at pp. 655-657] [indicating that *Bivans* rejected the argument that an alternative *state* court trespass action was as "effective" as a remedy based directly on the Constitution].)

Conversion actions (unlike the federal tort claim action held to be ineffective in *Carlson*) allow for jury trials. The state tort remedy of conversion applies just as much across California as a state constitutional remedy.

That leaves only factor (2), a possibility of punitive damages. We need not speculate whether, *if* a court were to recognize Bonner's claim for money damages for violation of the state due process clause, punitive damages might be available. (Cf. Gov. Code, § 818 [punitive damages not available for tort claims].) Suffice to say the *marginal* increase in deterrence that might come from the recognition of a constitutional due process claim (*if* such a claim existed and *assuming* it included the possibility of punitive damages) does not in itself justify creating such a claim in the first place. (See *Schweiker* v. *Chilicky* (1988) 487 U.S. 412, 428-429 [101 L.Ed.2d 370, 384-385, 108 S.Ct. 2460] [even if alternative of back benefits could not "fully" remedy the wrong, the court still rejected money damage remedy based on due process violation for plaintiffs who had Social Security disability benefits improperly denied them].) Though conversion may not (or may) carry the same legal megatonnage as a direct constitutional action with the possibility of punitive damages, Bonner has provided us with no reason why it would still not be an *effective* legal remedy against a taking of the sort he experienced.

*The Issue of Whether There Is a Right to Money Damages for Violations of the Equal Protection or Due Process Clauses of the State Constitution May Be Properly Considered for the First Time on Appeal*

■ Our determination that the state Constitution does not provide Bonner *any* cause of action for money damages in this case obviates the need to consider the jury instruction issue with which we dealt at some length in our prior opinion. There remains, however, a waiver issue. Bonner contends that the city waived any right to "contest" *whether* he had a right to the money damages based on constitutional violations.

■ As a general principle, of course, a litigant cannot raise a new issue for the first time on appeal; among other things, the practice is unfair to the trial court and any opposing litigants. But, as a general principle, it has its exceptions. On a number of occasions, California courts have held that constitutional issues can be raised for the first time on appeal in various circumstances. (E.g., *Hale* v. *Morgan* (1978) 22 Cal.3d 388, 394 [149 Cal.Rptr. 375, 584 P.2d 512] [considering issue, not raised at trial, of whether statute assessing penalties against landlords who turn off tenants' utilities to evict them was unconstitutional, and holding in certain circumstances it could be; "We have held that a litigant may raise for the first time

on appeal a pure question of law which is presented by undisputed facts."]; *People* v. *Blanco* (1992) 10 Cal.App.4th 1167, 1172-1173 [13 Cal.Rptr.2d 176] [appellate court exercised discretion to review whether evidentiary statute violated due process rights even though no constitutional attack was made at trial]; *Conservatorship of Delay* (1988) 199 Cal.App.3d 1031, 1035-1036, fn. 3 [245 Cal.Rptr. 216] ["In any event, issues may be raised for the first time on appeal when they involve pure questions of law or constitutional issues."]; *People* v. *Allen* (1974) 41 Cal.App.3d 196, 201, fn. 1 [115 Cal.Rptr. 839] [whether Fifth Amendment right against self-incrimination was violated by taking hair sample from defendant could be raised even though no objection was contained in the record]; *People* v. *Norwood* (1972) 26 Cal.App.3d 148, 153 [103 Cal.Rptr. 7] [if defendant was convicted under statute which did not prohibit the conduct proved, due process was violated and matter was reviewable]; see also *Ward* v. *Taggart* (1959) 51 Cal.2d 736, 741-742 [336 P.2d 534] [litigant who did not plead unjust enrichment at trial was allowed to recover on that theory because it did not "contemplate any factual situation different from that established by the evidence in the trial court"].)

As the court said in *People* v. *Norwood*, *supra*, 26 Cal.App.3d at page 152, "[a]n appellate court may note errors not raised by the parties if justice requires it." ▮ If anything, the question of whether Bonner could prevail strictly on the naked constitutional claims of due process or equal protection is especially appropriate for review the first time on appeal. For one thing, the question is one of pure law presented in a context where, in the *Ward* court's phrase, the factual situation is no "different from that established by the evidence in the trial court." (*Ward* v. *Taggart*, *supra*, 51 Cal.2d at p. 742.) For another, it would be highly anomalous for any court to sanction a litigant's recovery on constitutional causes of action that do not exist. It would be as if a litigant had obtained a monetary recovery against a state-owned liquor store based on the Eighteenth Amendment to the United States Constitution, and on appeal the court was required to affirm the judgment because the liquor store's attorney had forgotten to mention that, oh by the way, the Eighteenth Amendment had been repealed a half entury earlier. We think it goes without saying that litigants cannot, by failing to raise a question of law before the trial court, effectively create a cause of action out of thin air, particularly a direct constitutional cause of action without foundation in the constitutional text.[11]

Indeed, it is the latter point that refutes Bonner's argument that our earlier opinion had somehow incorrectly "rescued" the city from its counsel's failure to raise the constitutional issue at trial. Would this court, he asks

---

[11]They can, of course, settle based on their misapprehensions.

rhetorically, rescue him from the voluntary dismissal of his tort claim for conversion? The answer is, conversion is an established cause of action, the existence of which does not violate the fundamental law of the land. One can waive or forfeit an otherwise valid tort claim. A constitutional cause of action, the existence of which depends solely on the opposition's failure to argue that it does not exist, is something completely different.

Speaking of issues not raised by the city, however, we must add that our decision in this case does not address the further question of whether, under the state due process clause, an individual in Bonner's situation could sue the *city*, as distinct from the individual agents of the city. For the moment, it is enough to note that there is a relatively recent and unanimous United States Supreme Court opinion in *FDIC* v. *Meyer* (1994) 510 U.S. 471, 482-486 [127 L.Ed.2d 308, 321-324, 114 S.Ct. 996, 1004-1006] [discharged savings and loan executive did not have *Bivans* action for violation of due process against federal agency because purpose of *Bivans* is to deter federal *officer*, not agency for whom he or she works] which suggests that, even if Bonner's conversion claim was not a sufficient alternative, he would have to run another gauntlet to make the city liable.

### DISPOSITION

The judgment is reversed with directions to enter judgment in favor of the city. In light of Bonner's having prevailed at trial, our earlier opinion giving him a chance at some recovery on his due process claim, and the fact the City of Santa Ana did not raise the dispositive point at trial, it is fitting that the parties bear their own costs on appeal. Obviously the argument in Bonner's cross-appeal that the trial court should have awarded him attorney fees falls with the loss of his two causes of action.

Wallin, J., and Sonenshine, J., concurred.

The petition of appellant Marshone Bonner for review by the Supreme Court was denied Augusut 28, 1996. Mosk, J., Chin, J., and Brown, J., were of the opinion that the petition should be granted.