Filed 5/12/15  P. v. Gomez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059722 |
| v. | (Super.Ct.No. SWF1200847) |
| JOSE ANTONIO GOMEZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Timothy F. Freer, Judge.

Affirmed with directions.

Jessica C. Butterick, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood, and Meagan J. Beale, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I

## INTRODUCTION

Defendant Jose Antonio Gomez appeals from judgment entered following jury convictions for making a criminal threat (Pen. Code, § 422;[1] count 1) and assault with a deadly weapon (§ 245, subd. (a)(1); count 2). Defendant admitted a prison prior enhancement. (§ 667.5, subd.[2] (b).) The trial court sentenced defendant to a prison term of four years eight months.

Defendant contends there was insufficient evidence to support his criminal threat conviction, and the trial court erred in failing to instruct sua sponte on the lesser-included offense of attempted criminal threat. Defendant also argues permanent suspension of his driving privileges under Vehicle Code section 13351.1, violated his constitutional equal protection rights. We disagree and affirm the judgment but order the trial court to amend its September 6, 2013 minute order and the abstract of judgment by deleting the language, "License is suspended for life. Surrender driver license to the Court for forwarding to DMV." The trial court is also directed to insert a statement that defendant was convicted of a felony violation of section 245 and the trial court found a vehicle constituted the deadly weapon or instrument used to commit the offense.

---

[1] Unless otherwise noted, all statutory references are to the Penal Code.

[2] On the People's motion, the trial court dismissed count 3, misdemeanor reckless driving (Veh. Code, § 23103, subd. (a)).

## FACTS

During the morning of March 5, 2012, just after the traffic light turned green, Aaron Jiron drove his company's utility van around defendant's pickup. Defendant's pickup truck had been stopped at a red light at the intersection of Florida and Cawston. Both vehicles were headed eastbound on Florida Avenue. After Jiron passed defendant, he moved back into defendant's lane, in front of defendant's truck. In response, defendant drove into the left-turn lane, passed Jiron, pulled back into Jiron's lane in front of Jiron, and slammed on his brakes about 20 feet in front of Jiron. This forced Jiron to brake suddenly and nearly come to a full stop. After momentarily stopping, defendant proceeded driving forward, and Jiron followed behind, with defendant repeatedly applying his brakes.

In an attempt to get away from defendant, Jiron pulled into a shopping plaza, stopping at a Carl's Jr. Defendant made a U-turn into the Carl's Jr. parking lot and pulled up beside Jiron's van. Defendant stopped his truck in the exit driveway, in front of Jiron's van. Jiron and his passenger, Adam Saxer, had already gotten outside the van. Jiron was concerned when he discovered defendant had followed him into the parking lot. Jiron said to defendant, "What the f---?" Defendant reached into the center console of his truck, pulled out something shiny, and said, "Do you want me to shoot you?" At first, Jiron could not recall exactly what defendant said because it happened so fast. Jiron retreated.

3

Jiron testified he and Saxer were out of the van for six seconds. Jiron was scared for a minute or two because of defendant's threat. Based on defendant's words and actions, Jiron believed defendant had a gun, was threatening Jiron with it, and would act on his threat at that particular moment. Jiron said he was in fear for his life, but not for long; just for a minute or two. The entire time defendant was following defendant, Jiron believed defendant had a weapon but figured defendant was too cowardly to pull the trigger. Neither Jiron nor Saxer had a weapon and neither of them approached defendant or threatened him.

After defendant threatened Jiron, Jiron ran back to the van, jumped in, and took off. Defendant also drove off. In order to avoid interacting with defendant, Jiron drove around the stores before resuming his route. Jiron did not call 911 because defendant had left and Jiron thought the situation had been diffused.

As Jiron continued driving east on Florida Avenue, he saw a row of cars stopped or moving to the left just west of the intersection of Florida Avenue and Sanderson. Just beyond the intersection, defendant was creeping along slowly in his truck, in the right-hand lane. Other cars were driving around him. After all of the cars in front of Jiron moved to the left and passed defendant, Jiron was left directly behind defendant. Defendant then accelerated his truck in reverse and charged toward Jiron's van at a high rate of speed. Jiron described defendant's driving as "Full-fledged pedal to the metal" with "[t]ires smok[ing] from him—him throwing it in reverse." Defendant stopped less than a foot from Jiron's van, barely avoiding slamming into the van, and then drove off

4

eastbound on Florida Avenue. Jiron panicked and screamed. He was scared. He thought defendant would crash into him. Saxer called 911. A recording of the call was played for the jury. Saxer reported defendant had a gun and had cut Jiron off as he and Jiron were driving.

Jiron continued on his way to work, driving north on Kirby Street and east on Menlo Avenue. Although defendant was ahead, on the same route, Jiron denied he intentionally followed him, until Jiron turned onto Menlo Avenue. Up until then, Jiron was following his GPS. Jiron then decided to follow defendant because Jiron believed defendant was armed. Although Jiron did not fear defendant would shoot him, Jiron wanted defendant arrested. Along the way, defendant stopped his truck and threw a soda can at Jiron's van.

At 10:22 a.m., Police Officer James Duncan responded to Saxer's call reporting road rage with a gun. Meanwhile Sergeant Davis pulled over defendant and detained him. When Duncan arrived, he saw Davis conducting the traffic stop of defendant. Defendant was seated on the side of road and Jiron's van was parked nearby on Menlo Avenue, near State Street. Duncan interviewed defendant, Jiron, and Saxer. Duncan testified that Jiron and Saxer were "visibly shaken. [¶] . . . [¶] They appeared nervous, kind of like wide-eyed, like a little in disbelief." Defendant appeared indifferent. There were fresh skid marks on the street at Sanderson and Florida Avenue, consistent with Jiron's statement. The officers did not find a gun in defendant's possession or in his truck. Defendant was arrested.

5

III

SUSTAINED FEAR

Defendant contends the prosecution failed to meet its burden of proving defendant committed a criminal threat in violation of section 422, because there was insufficient evidence defendant's threat caused Jiron reasonably to be in sustained fear for his own safety.

This court applies the substantial evidence standard of review when determining whether the evidence is sufficient to support a criminal conviction. (*People v. Fierro* (2010) 180 Cal.App.4th 1342, 1347.) Under that standard, the Court of Appeal "'"'"reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find [the elements of the crime] beyond a reasonable doubt.'" [Citations.] "'"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment."'" [Citation.]' [Citation.] . . . 'Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. [Citation.]' [Citation.]" (*Ibid.*)

In order to prove the crime of committing a criminal threat, in violation of section 422, the prosecution must prove that "the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's

6

safety.'" (*People v. Toledo* (2001) 26 Cal.4th 221, 228.) The term "sustained fear," within the meaning of section 422, is defined as "a period of time that extends beyond what is momentary, fleeting, or transitory." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156.) "The victim's knowledge of defendant's prior conduct is relevant in establishing that the victim was in a state of sustained fear." (*Ibid.*)

In *People v. Fierro, supra,* 180 Cal.App.4th 1342, the court held that evidence defendant told the victim, "I will kill you . . . right now," coupled with displaying a weapon to the victim, was sufficient to support a finding that the defendant's threat caused sustained, reasonable fear, within the meaning of section 422. (*Id.* at pp. 1348-1349.) In *Fierro*, the victim encountered the defendant at a gas station. The victim believed the defendant was blocking access to the pumps and asked the defendant to move his car. The defendant told the victim to ask in Spanish and walked into the store. The victim followed the defendant and asked him again to move his car. The defendant again told the victim to ask in Spanish. The victim cursed the defendant, returned to his car, and waited for the defendant to finish fueling. After he did so, there was additional hostile interaction between the defendant and victim. (*Id.* at pp. 1345-1346.)

A second confrontation occurred in *Fierro*, shortly after the first, when the defendant got out of his car, approached the victim, and told the victim, "Do you want to fuck with me now?" (*People v. Fierro, supra,* 180 Cal.App.4th at p. 1345.) The defendant stood about seven feet from the victim by the victim's car and lifted his shirt to display a weapon tucked into his waistband. The victim believed the weapon was a gun.

He testified he was "a little scared" the defendant would shoot him and his son. The victim further testified that, while the defendant displayed the weapon, the victim was in fear for his and his son's life. (*Id.* at p. 1346.) The defendant cursed at the victim and said, "I should kill you. I will kill you." (*Ibid.*) Pointing at the victim's son, the defendant said he ought to kill the son too. The defendant added he should kill the two of them right then. Then he told the victim and his son to leave. The victim testified that as he was driving away, he felt "scared to death during the whole ordeal." About 15 minutes later, while on the freeway, out of harm's way, he called 911 and said he was "scared shitless." (*Ibid.*)

Based on the history between the defendant and victim during the two confrontations, the *Fierro* court concluded the threat actually caused sustained fear: "Facing what he thought was a gun and hearing words to the effect that he and his son were about to be killed, Mr. Ibarra was in sustained fear for his and his son's life. The fear lasted not only through the minute or so that appellant stood there exposing his weapon, but for up to 15 minutes after Ibarra drove away." (*People v. Fierro, supra,* 180 Cal.App.4th at p. 1348.) The court rejected the defendant's argument that the threat itself did not exceed 40 seconds and therefore there was no sustained fear. The court noted, "This argument ignores human nature." (*Id.* at p. 1349.) Although the threat did not last 15 minutes, the fear continued for that period after the threat. (*Ibid.*, fn. 6.)

In holding there was sufficient evidence of the element of sustained fear, the *Fierro* court concluded that a person who hears someone say, "'I will kill you . . . right

8

now,'" coupled with seeing a weapon, is quite justified in remaining scared for 15 minutes. In addition, such fear of a defendant, who is armed, mobile, and at large, and who has threatened to kill the victim and his son, is more than sufficient to constitute "sustained" fear under section 422. (*People v. Fierro, supra,* 180 Cal.App.4th at p. 1348.) The *Fierro* court added that, even if the court accepted the defendant's argument that sustained fear only lasted 40 seconds, until the threat ended, the *Fierro* court believed "the minute during which Ibarra heard the threat and saw appellant's weapon qualifies as 'sustained' under the statute. When one believes he is about to die, a minute is longer than 'momentary, fleeting, or transitory.' [Citation.]" (*Id.* at p. 1349.)

In *People v. Culbert* (2013) 218 Cal.App.4th 184, the defendant was convicted of committing a criminal threat offense. The crime was committed when the defendant attempted to teach his 15-year-old stepson a lesson. The defendant held an unloaded firearm to the child's head, told the child never to lie to him, and pulled the trigger three times. (*Id.* at p. 188.) The child testified he was very scared the defendant was going to "blow his head off." (*Ibid.*) After the defendant lowered the gun, he hugged the child and told him, "'let that be a lesson.'" A few minutes later the defendant said "'that was just a warning, and I won't really ever hurt you.'" (*Ibid.*) Evidence was introduced that the defendant had a prior section 422 conviction for threatening to kill his ex-wife because she would not allow him to have an unsupervised visit with their children. (*Id.* at p. 189.)

The defendant in *Culbert* argued there was insufficient evidence of sustained fear because the gun incident could not have lasted more than a split second and the child knew the gun was unloaded. Therefore any fear from the incident was instantly over. The *Culbert* court stated that this argument "misapprehends the nature of fear." (*People v. Culbert, supra,* 218 Cal.App.4th at p. 190.) The court concluded there was substantial evidence of sustained fear, explaining, "Even if the encounter lasts only one minute, a person who is confronted with a firearm held by an angry perpetrator and who believes his or her death is imminent, suffers sustained fear." (*Id.* at pp. 190-191.)

When concluding there was sufficient evidence of sustained fear, the *Culbert* court further considered the victim's conduct during and after the criminal threat incident: "[T]he idea that H. did not experience sustained fear because he knew within a 'split second' that the firearm was unloaded is, at least in our opinion, preposterous. H. realized the firearm was unloaded only because he was still breathing after appellant stopped pulling the trigger. H. must have had a sense of relief when he saw that he had not been shot. Experiencing relief that one has survived is not the same thing, however, as having one's fear evaporate. The jury could easily infer from the evidence of H's conduct both during and after the incident that his fear was sustained, and not 'instantly over.'" (*People v. Culbert, supra,* 218 Cal.App.4th at p. 191.)

As in *Fierro* and *Culbert*, in the instant case, the brief moment during which defendant threatened to shoot Jiron and displayed a shiny object, which Jiron and Saxer believed was a gun, qualifies as sustained fear under section 422. (*People v. Fierro,*

*supra,* 180 Cal.App.4th at p. 1349.)  In addition, defendant's conduct before, during and after his threat to shoot Jiron, supports a finding of sustained fear that was more than "momentary, fleeting, or transitory," while defendant pursued and harassed Jiron and Saxer.  Defendant committed frightening acts of road rage directed toward Jiron, which conveyed an intent to terrorize Jiron and Saxer, and endanger their safety.  (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156.)  There was evidence Jiron and Saxer's fear from defendant threatening to shoot them with a gun lasted one to two minutes. Although Jiron made statements minimizing his fear, his and Saxer's sustained fear was still objectively evident after defendant was detained.  Officer Duncan testified that, when he interviewed Jiron and Saxer, shortly after detaining defendant, they were "visibly shaken.  [¶] . . . [¶]  They appeared nervous, kind of like wide-eyed, like a little in disbelief."

Defendant's reliance on *In re Ricky T.* (2001) 87 Cal.App.4th 1132 (*Ricky T.*), for the proposition Jiron did not have sustained fear, is misplaced.  In *Ricky T.*, in which the court held there was no showing of sustained fear, the criminal threat charge was based on the defendant student uttering intemperate, disrespectful remarks, including threatening to "get" a teacher.  (*Id.* at p. 1140.)  The defendant did not make any physical movements or gestures or threats to injure the teacher. The teacher responded by sending the student to the school office, and did not call the police.  There was no prior history between the defendant and the teacher.  In the instant case, on the other hand, there is evidence defendant threatened to shoot

11

the victim with a gun, which under *Fierro* and *Culbert*, is sufficient to support a finding the victim sustained fear within the meaning of section 422.

IV

INSTRUCTIONAL ERROR

Defendant contends the trial court erred in failing to instruct sua sponte on the lesser included offense of attempted criminal threat. The People argue the trial court's failure to instruct on the lesser included offense was invited error because defense counsel and defendant told the trial court defendant did not want the instruction.

"Under the doctrine of invited error, when a party by its own conduct induces the commission of error, it may not claim on appeal that the judgment should be reversed because of that error." (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212.) "'The obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given.' [Citation.]" (*People v. Eilers* (1991) 231 Cal.App.3d 288, 295, fn. 4.) Nonetheless, the trial court's error in not giving instruction on a lesser included offense cannot be relied upon by defendants to justify a reversal because the commission of such error was "invited" by defendant. "The only effect of the defendant's objection is to render that error 'invited' and therefore nonreversible." (*People v. Eilers, supra,* 231 Cal.App.3d at pp. 295-296; see *Barton,* at p. 198.)

In the instant case, during a hearing on the jury instructions, the trial court stated that there was sufficient evidence to warrant giving an instruction on the lesser included

12

offense of attempted criminal threat, based on Jiron's testimony his fear from the threat was momentary. Defendant's attorney informed the court defendant requested that the instruction on the lesser included offense of attempted criminal threat not be given based on strategic reasons. Defendant also personally stated he agreed he did not want the instruction. The court agreed not to give the instruction but assured defendant that if he changed his mind and wanted it, the court would give it.

The following day, the court discussed the instructions with counsel and again raised the lesser included offense of attempted criminal threat. The prosecutor requested instruction on the lesser included offense. The court agreed the instruction was supported by the evidence but refused to give it because defendant had objected to it, and specifically and intelligently waived the instruction for strategic reasons. Defense counsel affirmed that defendant did not want the instruction because his defense was that proof of the elements of the criminal threat crime had not been met at all. Also, the penalty for the lesser offense was not significantly less. (§§ 18, 422, 664, subd. (a).) The benefit of the possibility of being convicted of attempted criminal threat was outweighed by the potential benefit of attempting to convince the jury defendant had made no criminal threat at all.

The trial court confirmed that defendant made a full and intelligent waiver of his right to have the instruction on the lesser included offense. Accordingly, the court declined to give the instruction. Under such circumstances, any error in not instructing

13

on attempted criminal threat was invited and therefore nonreversible on appeal. (*People v. Prince* (2007) 40 Cal.4th 1179, 1265.)

Posttrial, the trial court noted it had reviewed the evidence relating to the lesser included offense of attempted criminal threat and concluded that, not only had defendant waived instruction on the lesser included offense, but, in addition, there was insufficient evidence to support such instruction. Defendant argues that, because the trial court rejected the instruction on the lesser included offense based on insufficiency of evidence, not because of invited error, defendant is not barred from raising the error on appeal. We disagree. The trial court's consideration of the sufficiency of the evidence supporting the instruction and related comments were posttrial, after the court had already stated it was not giving the instruction because of defendant's strategic request not to give it. The invited error doctrine applies and therefore bars defendant from raising the objection on appeal.

V

REVOCATION OF DRIVING PRIVILEGES

During the sentencing hearing, the trial court ordered defendant to surrender his driver's license to the Department of Motor Vehicles (DMV) and ordered defendant's license suspended for life based on his conviction for assault with a deadly weapon, a motor vehicle, under section 245, subdivision (a). The trial court stated: "[Defendant] cannot possess a firearm for the remainder of his life because of – of the conviction for the assault, using a motor vehicle. [¶] He is to surrender any driver's license to the

14

Department of Motor Vehicles and he is suspended for life. His license is suspended for life because of that conviction." The sentencing minute order states: "License is suspended for life. [¶] Surrender driver license to the Court for forwarding to DMV. (Defendant has no driver license in his possession at this time.)" Defendant did not object to imposition of these sentencing terms.

Defendant contends Vehicle Code section 13351.5 is unconstitutional because it violates defendant's equal protection rights. Defendant requests this court therefore to direct the trial court to amend the abstract of judgment to delete its order suspending his driver's license for life.

A. *Defendant Did Not Forfeit His Constitutional Challenge*

The People argue defendant forfeited his constitutional challenge to Vehicle Code section 13351.5 because he did not raise his objection during sentencing in the trial court. Generally, a litigant cannot raise a new issue for the first time on appeal. But this general principle has its exceptions. "'[I]ssues may be raised for the first time on appeal when they involve pure questions of law or constitutional issues.'" (*Bonner v. City of Santa Ana* (1996) 45 Cal.App.4th 1465, 1477; in accord, *People v. Yeoman* (2003) 31 Cal.4th 93, 118.)

Here, defendant did not challenge in the trial court the constitutionality of Vehicle Code section 13351.5. Nevertheless, his objection on appeal is not barred because it involves a pure question of law and a constitutional issue. In addition, this court may review the issue because defendant asserts the trial court imposed an unauthorized

15

sentence by ordering a lifetime suspension of his driver's license under Vehicle Code section 13351.5. (*People v. Scott* (1994) 9 Cal.4th 331, 354; *People v. Linares* (2003) 105 Cal.App.4th 1196, 1199, fn. 2.) We therefore review de novo the issue of whether Vehicle Code section 13351.5 violates the equal protection clause under the state and federal Constitutions. (*Alviso v. Sonoma County Sheriff's Dept.* (2010) 186 Cal.App.4th 198, 204.)

*B. Constitutionality of Vehicle Code Section 13351.5*

Vehicle Code section 13351.5 requires lifetime revocation of the driver's license of a person who has been convicted of assault with a deadly weapon under section 245, by means of a vehicle. Vehicle Code section 13351.5 provides in relevant part: "(a) Upon receipt of a duly certified abstract of the record of any court showing that a person has been convicted of a felony for a violation of Section 245 of the Penal Code and that a vehicle was found by the court to constitute the deadly weapon or instrument used to commit that offense, the department immediately shall revoke the privilege of that person to drive a motor vehicle. [¶] (b) The department shall not reinstate a privilege revoked under subdivision (a) under any circumstances."

Defendant argues Vehicle Code section 13351.5 violates his equal protection rights under the state and federal Constitutions because there is no rational basis for the automatic lifetime bar of defendant's driver's privileges. We reject defendant's constitutional challenge. "'The equal protection guarantees of the Fourteenth Amendment and the California Constitution are substantially equivalent and analyzed in

16

a similar fashion. [Citations.]' [Citation.] We first ask whether the two classes are similarly situated with respect to the purpose of the law in question, but are treated differently. [Citation.] If groups are similarly situated but treated differently, the state must then provide a rational justification for the disparity. [Citation.]" (*People v. Lynch* (2012) 209 Cal.App.4th 353, 358.)

Defendant argues that in enacting Vehicle Code section 13351.5, the Legislature distinguished between two groups of people convicted of crimes involving motor vehicles. The first group includes those convicted under section 245 of felony assault with a deadly weapon, where the weapon is a vehicle. Their driver's licenses are automatically revoked under Vehicle Code section 13351.5. The second group, which defendant argues is similarly situated to the first group, consists of those convicted of equally or more dangerous vehicular crimes, who are not subject to a mandatory, lifetime revocation of their driver's licenses. Defendant contends the challenged classification here, the first group, does not bear a rational relationship to a legitimate state interest.

Assuming, without deciding, that violators of the two groups of vehicular crimes are sufficiently similarly situated with respect to the purpose of the law in question (Veh. Code, § 13351.5), but are treated differently, we must determine whether there is a rational justification for the disparity in treatment of the two groups. We must consider whether there is a rational justification for imposing a lifetime driver's license ban under Vehicle Code section 13351.5 on those in the first group who commit a section 245

17

assault by means of a vehicle, and not imposing such a severe penalty on all others who commit vehicular crimes.

In determining whether the classification is rationally related to a legitimate state interest, this court must determine whether the classification is rationally related to a "'realistically conceivable legislative purpose[].'" (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1201.) "''"[A] statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge *if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.*'''" (*Id.* at pp. 1200-1201.) "'The rationale must be "plausible" [citation] and the factual basis for that rationale must be *reasonably* conceivable [citation].' [Citations.] While 'it is irrelevant whether the perceived reason for the challenged distinction actually motivated the Legislature, equal protection "does require that a purpose may conceivably or 'may reasonably have been the purpose and policy' of the relevant governmental decisionmaker" [citation] and that "the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." [Citation.] Thus, . . . we must undertake "''"*a serious and genuine judicial inquiry* into the correspondence between the classification and the legislative goals"'''" [citation] by inquiring whether "'the statutory classifications are rationally related to the "realistically conceivable legislative purpose[s]" [citation]' . . . and . . . by declining to 'invent[] fictitious purposes that could not have been within the contemplation of the

18

Legislature . . . .'"  [Citation.]'  [Citations.]"  (*People v. Noyan* (2014) 232 Cal.App.4th 657, 667-668; see *People v. Hofsheier, supra,* 37 Cal.4th at p. 1201.)

Defendant asserts there is no legislative history of Vehicle Code section 13351.5 that sheds light on the rationale for the classification and no plausible reason for the classification.  Defendant argues the classification is irrational in the statutory scheme because, in general, the type of driver's license suspension or revocation imposed turns on the gravity of the offense, the risk the criminal behavior poses to the general public, and recidivism.  The section 245 offense of assault with a deadly weapon, by means of a motor vehicle, is the only vehicular crime requiring the mandatory, lifetime revocation of a defendant's driving privileges under Vehicle Code section 13351.5.

While there may be no insightful legislative history, there is a plausible reason for imposing the mandatory, lifetime revocation of a defendant's driving privileges only on those who commit a section 245 assault by means of a vehicle.  The second group of vehicular crimes do not require a finding the defendant intentionally used a vehicle as a means of harming another person.  The second group of crimes includes violations of Vehicle Code sections 13351, subdivision (a)(1) (vehicular manslaughter); 13351, subdivision (a)(3) (causing death while fleeing from the police); and 13351, subdivision (a)(2), (3) or more convictions in one year for hit and run, reckless driving with injury, or vehicular manslaughter while intoxicated.

This distinction between the two groups provides a plausible reason for the classification and different treatment under Vehicle Code section 13351.5.  Driving is a

19

privilege, not a right. (*People v. Linares* (2003) 105 Cal.App.4th 1196, 1199.) A serious, intentional abuse of the driving privilege by using a vehicle as a weapon constitutes a rational basis for permanently taking away the right to drive from those who intentionally use a vehicle to harm others. Vehicle Code section 13351.5 protects the public from those who pose a risk of committing assaults by means of a vehicle, based on their past history of committing such acts. Because there is a rational justification for the disparity in permanently revoking the driver's licenses of those who commit a section 245 assault by means of a vehicle, but not imposing such penalty as to all other vehicular offenses, we conclude Vehicle Code section 13351.5 is constitutional facially and as applied to defendant.

## C. The Trial Court Lacked Authority to Suspend Defendant's Driver's License

Revocation of a defendant's driver's license under Vehicle Code section 13351.5 is a mandatory administrative function. (*In re Grayden N.* (1997) 55 Cal.App.4th 598, 604 (*Grayden N.*).) "Simply put, the . . . court is bound, under the statute, to report to the [DMV] the true finding [defendant] committed an assault with a deadly weapon in violation of Penal Code section 245, subdivision (a), and the true finding the weapon . . . used was a vehicle." (*Ibid.*) License revocation is a civil, not a criminal, sanction. (*People v. Linares, supra,* 105 Cal.App.4th at p. 1199.) It is the DMV, not the court, that has the power administratively to suspend or revoke a driver's license under Vehicle Code section 13351.5. (*Grayden N.,* at p. 604; *Larsen v. Department of Motor Vehicles* (1995) 12 Cal.4th 278, 284 [the act of the DMV in suspending a driver's license pursuant

20

to Vehicle Code sections authorizing them to do so an administrative act in performing a mandatory function and the DMV, having received an abstract of judgment is simply required to suspend the defendant's driving privilege]).  The DMV's suspension or revocation of defendant's driving privilege under Vehicle Code section 13351.5 is substantively distinct from any punishment a court may impose as a result of a criminal conviction.  In other words, the DMV's lifetime revocation, imposed pursuant to Vehicle Code section 13351.5, is an administrative civil sanction that is independent of the trial court's penal sanction.  "In numerous instances under provisions of California law, a criminal conviction may give rise to a variety of collateral consequences."  (*Larsen,* at p. 283.)  This is one such case.

For license revocation or suspension under Vehicle Code section 13351.5 to occur, the DMV must receive a certified abstract of judgment, which shows not only that the defendant was convicted under section 245, but also that the trial court found defendant used a vehicle as "the deadly weapon or instrument" in committing the offense.  (Veh. Code, § 13351.5, subd. (a).)  Here, the court minute order and abstract of judgment do not show this. Thus, if the abstract of judgment were provided to the DMV, it would give the DMV no basis to suspend or revoke defendant's license.

Furthermore, the Legislature plainly did not intend the trial court to suspend or revoke a driver's license under Vehicle Code section 13351.5, as the court purported to do here.  Division 6 of the Vehicle Code, which deals with drivers' licenses (Veh. Code, § 12500 et seq.), contains a chapter covering suspension or revocation of licenses on all

21

possible grounds (ch. 2; Veh. Code, §§ 13100 et seq.). This chapter consists mostly of two articles: article 2 (Suspension or Revocation by Court; Veh. Code, §§ 13200-13210) and article 3 (Suspension and Revocation by Department; Veh. Code, §§ 13350-13392). We must presume that the Legislature put each suspension and revocation proceeding into one or the other article deliberately. Thus, where, as here, the Legislature has said the DMV is to suspend or revoke a license, we may not conclude that the Legislature really meant the court to do it or did not care who did it. "[T]he DMV, not the court, is empowered to revoke a driver's license. [Citation.]" (*People v. Linares, supra,* 105 Cal.App.4th at p. 1199.) The trial court, however, is empowered under Vehicle Code section 13351.5 to refer the matter to the DMV for suspension or revocation.

Because only the DMV has the statutory authority to suspend or revoke defendant's license, and the trial court minute order and abstract of judgment do not include the findings required for the DMV to revoke or suspend defendant's license under Vehicle Code section 13351.5, the trial court minute order and abstract of judgment must be modified to reflect the trial court's finding that defendant used his vehicle as a deadly weapon to commit the section 245 offense. The court order suspending defendant's driver's license also must be stricken from the minute order and abstract of judgment, because the trial court does not have authority to suspend defendant's driver's license under Vehicle Code section 13351.5.

22

VI

DISPOSITION

The court is directed to modify its September 6, 2013 minute order and abstract of judgment as follows: (1) delete the statements "License is suspended for life. Surrender driver license to the Court for forwarding to DMV," and (2) insert a statement that defendant was convicted of a felony violation of section 245 and the trial court found a vehicle constituted the deadly weapon or instrument used to commit the offense. The trial court is further ordered to issue a modified abstract of judgment and to forward a certified copy to (1) the DMV, and (2) the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

McKINSTER
J.

23